NORTHERN INDIANA PUBLIC SER-
VICE COMPANY, an Indiana
corporation, Plaintiff-Appellant,

v.

CARBON COUNTY COAL COMPANY,
a partnership, Defendant-Appellee.

Nos. 85–2110, 86–1069, 86–1074
and 86–1575.

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1986.
Decided Aug. 13, 1986.

Joseph R. Lundy, Schiff, Hardin & Waite, Chicago, Ill., for plaintiff-appellant.

Terry M. Grimm, Winston & Strawn, Chicago, Ill., for defendant-appellee.

Before POSNER and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

These appeals bring before us various facets of a dispute between Northern Indiana Public Service Company (NIPSCO), an electric utility in Indiana, and Carbon County Coal Company, a partnership that until recently owned and operated a coal mine in Wyoming. In 1978 NIPSCO and Carbon County signed a contract whereby Carbon County agreed to sell and NIPSCO to buy approximately 1.5 million tons of coal every year for 20 years, at a price of $24 a ton subject to various provisions for escalation which by 1985 had driven the price up to $44 a ton.

NIPSCO's rates are regulated by the Indiana Public Service Commission. In 1983 NIPSCO requested permission to raise its rates to reflect increased fuel charges. Some customers of NIPSCO opposed the increase on the ground that NIPSCO could reduce its overall costs by buying more electrical power from neighboring utilities for resale to its customers and producing less of its own power. Although the Commission granted the requested increase, it directed NIPSCO, in orders issued in December 1983 and February 1984 (the "economy purchase orders"), to make a good faith effort to find, and wherever possible buy from, utilities that would sell electricity to it at prices lower than its costs of internal generation. The Commission added ominously that "the adverse effects of entering into long-term coal supply contracts which do not allow for renegotiation and are not requirement contracts, is a burden which must rest squarely on the shoulders of NIPSCO management." Actually the contract with Carbon County did provide for renegotiation of the contract price—but one-way renegotiation in favor of Carbon County; the price fixed in the contract (as adjusted from time to time in accordance with the escalator provisions) was a floor. And the contract was indeed not a requirements contract: it specified the exact amount of coal that NIPSCO must take over the 20 years during which the contract was to remain in effect. NIPSCO was eager to have an assured supply of low-sulphur coal and was therefore willing to guarantee both price and quantity.

Unfortunately for NIPSCO, as things turned out it was indeed able to buy electricity at prices below the costs of generating electricity from coal bought under the contract with Carbon County; and because of the "economy purchase orders," of which it had not sought judicial review, NIPSCO could not expect to be allowed by the Public Service Commission to recover in its electrical rates the costs of buying coal from Carbon County. NIPSCO therefore decided to stop accepting coal deliveries from Carbon County, at least for the time being; and on April 24, 1985, it brought this diversity suit against Carbon County in

a federal district court in Indiana, seeking a declaration that it was excused from its obligations under the contract either permanently or at least until the economy purchase orders ceased preventing it from passing on the costs of the contract to its ratepayers. In support of this position it argued that the contract violated section 2(c) of the Mineral Lands Leasing Act of 1920, 30 U.S.C. § 202, because of Carbon County's affiliation with a railroad (Union Pacific), and that in any event NIPSCO's performance was excused or suspended—either under the contract's *force majeure* clause or under the doctrines of frustration or impossibility—by reason of the economy purchase orders.

On May 17, 1985, Carbon County counterclaimed for breach of contract and moved for a preliminary injunction requiring NIPSCO to continue taking delivery under the contract. On June 19, 1985, the district judge granted the preliminary injunction, from which NIPSCO has appealed. Also on June 19, rejecting NIPSCO's argument that it needed more time for pretrial discovery and other trial preparations, the judge scheduled the trial to begin on August 26, 1985. Trial did begin then, lasted for six weeks, and resulted in a jury verdict for Carbon County of $181 million. The judge entered judgment in accordance with the verdict, rejecting Carbon County's argument that in lieu of damages it should get an order of specific performance requiring NIPSCO to comply with the contract. Upon entering the final judgment the district judge dissolved the preliminary injunction, and shortly afterward the mine—whose only customer was NIPSCO—shut down. NIPSCO has appealed from the damage judgment, and Carbon County from the denial of specific performance and from the district judge's order staying execution of the damage judgment without requiring NIPSCO to post a bond guaranteeing payment of the judgment should NIPSCO lose on appeal.

■ NIPSCO's appeal from the grant of the preliminary injunction is moot, the injunction having been dissolved last October when the final judgment was entered. Lifting a preliminary injunction does not always make an appeal from the grant of the injunction moot; if the injunction was improper, the defendant may be entitled to damages. See Fed.R.Civ.P. 65(c); *Coyne-Delany Co. v. Capital Development Bd.*, 717 F.2d 385 (7th Cir.1983). But all that NIPSCO is asking for in appealing from the grant of the preliminary injunction is that the injunction be dissolved, and *that* request is moot. Later we shall see that another issue in the case, relating to the judge's instructions to the jury on *force majeure*, is also moot.

We are left with the following issues to decide: (1) whether the district judge abused his discretion in refusing to give NIPSCO more time to prepare for trial, (2) whether the contract was unenforceable as a violation of the Mineral Lands Leasing Act, (3) whether NIPSCO's obligations under the contract were excused or suspended by virtue of either the *force majeure* clause or (4) the doctrines of frustration or impracticability, (5) whether Carbon County was entitled to specific performance of the contract, and (6) whether NIPSCO should be required to post a bond in order to be allowed to stave off the execution of the damage judgment until the appellate process is over.

■ 1. When he issued the preliminary injunction, two months into the case, the district judge scheduled the trial to begin in two months. This was a tight deadline for the completion of pretrial discovery, though NIPSCO is wrong to argue that it violates a local rule of the Northern District of Indiana. Rule 12(d) provides that "in all civil cases except in patent, antitrust, and trade-mark cases, all discovery shall be completed within five months after the case is at issue." Five months is the maximum, not the minimum. With somewhat greater force NIPSCO argues that this case is extraordinary, even though it is not a patent, antitrust, or trademark case. Although the issues are no more complex than they would be if the contract had been for $1 million rather than $1 billion (the

estimated amount that NIPSCO would have owed over the life of the contract if the contract had not been cancelled), the large stakes justified a more careful and thorough preparation than if the stakes had been smaller: the consequences of an erroneous judgment were greater, so the optimal expenditure on avoiding error was greater. NIPSCO particularly complains about its inability to conduct thorough discovery of Carbon County's relationship to the Union Pacific Railroad—a relationship that as we shall see is the basis of NIPSCO's defense based on the Mineral Lands Leasing Act—and of Carbon County's theory of damages. And the only reason the district judge gave for drastically compressing the pretrial period was that his criminal trial calendar was so crowded (with cases not deferrable, because of the requirements of the Speedy Trial Act) that if he did not try the case in August 1985 he would have to put it over to April 1986—which still would have been only a year after the complaint was filed.

 Nevertheless we do not think the district judge abused his discretion in refusing to postpone the trial. Matters of trial management are for the district judge; we intervene only when it is apparent that the judge has acted unreasonably. The occasions for intervention are rare. At a time when a combination of very heavy caseloads with the pressure exerted by the Speedy Trial Act to take criminal cases out of order and try them first makes managing federal district courts' dockets trickier than ever before, district judges must be allowed considerable leeway in scheduling civil cases, and therefore in denying continuances that would disrupt their schedules. *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1366 (7th Cir. 1985); see also *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1193 (5th Cir.1986); cf. *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 608–09 (7th Cir.1986).

Of course some cases are so immense that it would be unrealistic to insist on trial after only two months for pretrial discovery, or even to insist on rigid adherence to deadlines in local rules. But this is not such a case. To begin with, the two-month figure is misleading. NIPSCO had decided in 1984 to stop accepting coal deliveries from Carbon County and had retained late in that year—nine months or more before the trial began—the large Chicago law firm that would later conduct the trial with the help of the much smaller Indiana firm that is NIPSCO's regular counsel. The Chicago firm has between 40 and 50 lawyers in its trial department. The timing of the suit was in the control of NIPSCO and its lawyers, and they could do much of their trial preparation before filing suit. True, they could not have conducted discovery then. Discovery is sometimes allowed before suit is filed, see Fed.R.Civ.P. 27(a), but not in the circumstances of this case. The defendants could, however, have begun discovery when they filed their suit, four months before the beginning of the trial and almost six months before the end; the latter is the relevant interval, because the judge interrupted the trial to allow NIPSCO to complete its discovery on the damage issue.

No case holds that the denial of a continuance in such circumstances is reversible error. The common element in cases that reverse such denials is the existence of changed circumstances to which a party cannot reasonably be expected to adjust without an extension of time. In *Sutherland Paper Co. v. Grant Paper Box Co.*, 183 F.2d 926, 931 (3d Cir.1950), the denial of certain pretrial motions just two weeks before the trial of a complex patent case, combined with the illness of the inventor, made it impossible for the defendants to complete their pretrial preparation without a continuance that the judge denied. In *Smith-Weik Machinery Corp. v. Murdock Machine & Engineering Co.*, 423 F.2d 842 (5th Cir.1970), the defendant's principal counsel became ill on the eve of trial, and its local counsel was not sufficiently well informed about the facts and pertinent law to conduct the trial by himself on such short notice. In *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 600–02 (9th Cir.1983), the judge refused to grant a con-

tinuance to enable the defendants' expert to rebut evidence newly discovered by the plaintiff. Other "surprise" cases are *Wells v. Rushing,* 755 F.2d 376, 380–81 (5th Cir. 1985); *Menendez v. Perishable Distributors, Inc.,* 763 F.2d 1374, 1379–80 (11th Cir.1985), and *Shelak v. White Motor Co.,* 581 F.2d 1155, 1159 (5th Cir.1978) (and see Judge Rubin's powerful dissent, *id.* at 1161–64). The element of changed circumstances is missing here.

■ Lack of precedent need not defeat NIPSCO's argument for reversal; NIPSCO can appeal to first principles, and ask us to forge new ground. But this we shall not do, when NIPSCO is unable to show how it was prejudiced by the compressed period for discovery and pretrial preparation, given the amount of time it had to plan the case before it filed suit and the large staff of lawyers at its disposal to conduct discovery once the suit began. On the view that we take of its defense of illegality, nothing NIPSCO could reasonably have been expected to obtain from additional discovery on the linkage between Carbon County and the Union Pacific Railroad could change the result of the case. As for damages, it is noteworthy both that NIPSCO does not complain in this court about the size of the jury verdict and that in April 1984 it had estimated that cancelling the contract would cost it $300 million in damages if Carbon County could show that the cancellation was a breach of contract. At argument NIPSCO's counsel acknowledged that the compression of the time for pretrial preparation was as harmful to Carbon County as to itself. Even if as a matter of abstract justice the judge should have given NIPSCO more time for conducting discovery, his refusal to do so would not be reversible error unless there was a reasonable probability that it caused NIPSCO to lose the case, see Fed.R.Civ.P. 61; *Fontenot v. Upjohn Co., supra,* 780 F.2d at 1194; *Menendez v. Perishable Distributors, Inc., supra,* 763 F.2d at 1380, and there is no indication of that. Finally, in arguing against the grant of a preliminary injunction NIPSCO had said that having to continue taking coal under the contract would be very costly to it; and if so it should have welcomed an early trial. *Business Ass'n of University City v. Landrieu,* 660 F.2d 867, 877–78 (3d Cir.1981), upheld the denial of a continuance in parallel circumstances.

Justified public concern with the expenses and delays of modern litigation requires reexamination of traditional attitudes about the big case—one of which is that such a case cannot be tried without leisurely pretrial preparation. Despite the abbreviated period for pretrial discovery in the present case, both parties had an adequate opportunity, which they used, to obtain all the evidence they needed for the trial and to scrutinize the opponent's evidence closely. Rather than believing that the district judge abused the broad discretion that our system gives trial judges in the management of litigation, we find nothing to criticize in the dispatch with which this big case was brought to judgment.

2. Section 2(c) of the Mineral Lands Leasing Act of 1920 provides in pertinent part that "no company or corporation operating a common-carrier railroad shall be given or hold a permit or lease under the provisions of this chapter [relating to federal lands] for any coal deposits except for its own use for railroad purposes...." Oddly in this litigious age, no reported decision has interpreted section 2(c) in the 66 years since its enactment. NIPSCO contends that if the statute is not to be made a dead letter, it must be read to forbid a railroad's affiliate to hold a mineral lease or permit on federal lands. Roughly 15 percent of Carbon County's projected output for the contract with NIPSCO was to come from federal lands that Carbon County had a permit to mine, and Carbon County is a partnership of two firms (each with a half interest in the partnership), Dravo Coal Company and Rocky Mountain Energy Company, the latter a wholly owned subsidiary of the Union Pacific Corporation, whose principal subsidiary is the Union Pacific Railroad Company.

When the contract was made back in 1978, the Department of Interior took the view that section 2(c) did not require the automatic piercing of corporate veils, and hence did not invalidate leases by subsidiaries or other affiliates of railroads unless the affiliate was an "alter ego" of the railroad, meaning that their corporate separateness was a paper formality with no business or economic significance. In 1980 the Department of Justice, while recommending to Congress that section 2(c) be repealed as an anachronism, advised it that the section does reach affiliates, and in 1982 the Department of the Interior adopted this interpretation, though only for prospective application. *Railroad Affiliates and Coal Leasing*, 89 I.D. 610 (1982).

█ No one doubts that section 2(c) reaches a lease by a railroad's alter ego. The statutory language, "company ... operating a ... railroad," can without contortion be interpreted to cover a situation where the railroad sets up a dummy corporation to hold a mineral lease on federal lands and places control of the mining operations in the railroad's management; if such facile evasions could not be prevented, the statute would have very little consequence. By way of comparison consider the effort of the Federal Communications Commission to make its requirement that communications common carriers conduct their terminal equipment business through separate subsidiaries a meaningful one by forbidding the subsidiary and the carrier to share staff or facilities. See *Illinois Bell Tel. Co. v. FCC*, 740 F.2d 465, 473–74 (7th Cir.1984). But if section 2(c) merely covers the railroad plus its alter egos, NIPSCO must lose, for Carbon County is not the alter ego of the Union Pacific Railroad. In recent years the railroad has generated only about half of Union Pacific Corporation's total revenues; and the corporation's Rocky Mountain subsidiary is only a 50 percent partner in Carbon County and the other partner both is unrelated to the Union Pacific family and was an active partner in the venture. Even if we treated the holding company as the alter ego of the railroad, we could not treat Carbon County so, if only because an equal partner cannot call the tune when the other partner is active, knowledgeable, and independent.

But does section 2(c) go beyond alter egos to embrace affiliates of railroads? It was enacted out of a fear that if railroads were allowed to own coal mines they would discriminate in transportation against competing coal mines which depended on rail transportation; this was thought to have happened in the anthracite mine fields of the eastern United States. See 58 Cong. Rec. 4739 (1919) (remarks of Sen. LaFollette); *United States v. Reading Co.*, 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760 (1920). Since the railroads owned their coal mines through subsidiaries rather than directly, it is indeed true that the purpose of section 2(c) could not be fully achieved unless "company ... operating a ... railroad" were interpreted to mean "company ... affiliated with a ... railroad." And strained as this interpretation might seem from a linguistic standpoint, other strained statutory interpretations have been adopted where necessary to prevent a statute's evident, but imperfectly expressed, purpose, whether of inclusion or exclusion, from being too easily defeated. Yet so patent is the oversight—given the corporate form in which the eastern railroads had held their coal mines, the narrow interpretation the Supreme Court had given the parallel "commodities clause" of the Interstate Commerce Act in *United States ex rel. Attorney Gen'l v. Delaware & Hudson Co.*, 213 U.S. 366, 413–14, 29 S.Ct. 527, 538, 53 L.Ed. 836 (1909), and the fact that an earlier version of the bill that became section 2(c) referred explicitly to subsidiaries and affiliates—that one suspects it was deliberate. The proponents of cracking down on railroads' ownership of coal mines must not have had the votes to get a fully effective statute. We note that *United States v. Reading Co.*, *supra*, 253 U.S. at 60–62, 40 S.Ct. at 433, as interpreted in *United States v. Elgin, Joliet & Eastern Ry.*, 298 U.S. 492, 501–02, 56 S.Ct. 841, 844, 80 L.Ed. 1300 (1936), became the source of an "alter ego" interpretation of the com-

modities clause which the Department of the Interior then borrowed for section 2(c) of the Mineral Lands Leasing Act. Perhaps no broader interpretation of the section can be squared with its language and history.

Support for this conclusion is found in the peculiar pattern of railroad land holdings in the West, described in *Leo Sheep Co. v. United States*, 440 U.S. 668, 672–77, 99 S.Ct. 1403, 1406–08, 59 . L.Ed.2d 677 (1979). Beginning in 1862, Congress, in an effort to induce the Union Pacific to build a transcontinental railroad, had granted the Union Pacific large tracts of land along the projected railroad right of way. To reduce the cost to the government, Congress configured the grant in a checkerboard pattern: the Union Pacific got alternate blocks of land, and as a result every block granted to the Union Pacific was surrounded by federal land and every block of federal land was surrounded by Union Pacific land. The idea was that the federal government would benefit equally with Union Pacific from any appreciation in land values that was brought about by the creation of the railroad. The checkerboard pattern created problems for coordinated development, and Congress in 1920 may not have wanted to inhibit the development of contiguous lands by preventing the Union Pacific from obtaining mineral leases for subsidiaries already engaged in mining on the railroad's own land. The complications caused by the checkerboard grant, as well as the obsolescence of the monopoly concerns (possibly exaggerated even in 1920) that had led to the passage of section 2(c), are what persuaded the Justice Department to recommend repealing the statute.

All this leaves in doubt whether section 2(c) reaches affiliate relationships short of alter egoism (on the distinction between a mere affiliate and an alter ego in other legal settings see, e.g., *Crest Tankers, Inc. v. National Maritime Union*, 796 F.2d 234 (8th Cir.1986)); but even if it does, the relationship here is so attenuated that one may doubt whether Carbon County should even be called an affiliate of the Union Pacific Railroad. And even if Carbon

County should not have been granted a permit to mine coal on federal land, this would not allow NIPSCO to avoid its obligations under the contract. To begin with, assuming there is a violation of section 2(c) lurking somewhere in the background, the contract itself is not illegal. The statute does not regulate sales of coal mined on federal land. It prohibits railroads from holding leases or permits to mine coal on those lands (other than for the railroad's own use—an anachronistic exception in the age of the diesel), but says nothing about *sales* of the coal. And it is not the sale that conceivably offends the statute but the seller's affiliation—a problem that could be solved, without termination of the contract, by Union Pacific Corporation's selling Rocky Mountain Energy Company. Moreover, Carbon County's mine is mainly on private land. Apparently there is not enough coal on that land to supply the entire contract; and the contract requires Carbon County to supply the coal for the contract from this mine. Nevertheless the contract could not be thought illegal in its entirety. At most NIPSCO could claim an abatement of some of the contract damages, representing profits that would have accrued from the sale of the coal mined on public land. NIPSCO claimed no such abatement.

Since this is not a case where the contract itself is illegal—as it would be if it were a contract in restraint of trade and therefore a violation of section 1 of the Sherman Act, or a contract to commit a bank robbery and therefore a criminal conspiracy—it is not governed by *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77–83, 102 S.Ct. 851, 856–59, 70 L.Ed.2d 833 (1982). Kaiser agreed to make extra contributions to a union welfare fund if Kaiser failed to adhere to an allegedly illegal boycott; the Court sustained the defense of illegality to a suit to enforce the agreement. The extra contributions were in effect a penalty for abandoning the boycott; the underlying agreement that the penalty was designed to enforce was thus an agreement to participate in the boycott. See also *Somerset*

*Importers, Ltd. v. Continental Vintners,* 790 F.2d 775 (9th Cir.1986). In contrast, the contract in this case is not "intrinsically illegal," *Trustees of the Operative Plasterers' and Cement Masons' Local Union Officers & Employees Pension Fund v. Journeyman Plasterers' Protective & Benevolent Soc'y, Local Union No. 5,* 794 F.2d 1217, 1220 (7th Cir.1986); and the defense of illegality does not come into play just because a party to a lawful contract (here a contract to supply coal to an electric utility) commits unlawful acts to carry out his part of the bargain. See, e.g., *Michigan Millers Mutual Fire Ins. Co. v. Canadian Northern Ry.,* 152 F.2d 292, 297 (8th Cir.1945); *Drost v. Professional Building Service Corp.,* 153 Ind.App. 273, 279, 286 N.E.2d 846, 850 (1972).

■ Second, supposing that the contract does violate section 2(c) of the Mineral Lands Leasing Act, this does not necessarily make it unenforceable. This issue, too, is one of federal rather than state law, though we have no reason to think Indiana law would require a different resolution of it; federal and state law on the contract defense of illegality—the latter well described in Farnsworth, Contracts §§ 5.5, 5.6 (1982)—seem quite similar. When the statute is federal, federal law determines not only whether the statute was violated but also, if so, and assuming the statute itself is silent on the matter, the effect of the violation on the enforceability of the contract. *Walsh v. Schlecht,* 429 U.S. 401, 407–08, 97 S.Ct. 679, 684–85, 50 L.Ed.2d 641 (1977); *Kelly v. Kosuga,* 358 U.S. 516, 519, 79 S.Ct. 429, 431, 3 L.Ed.2d 475 (1959); *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165 (1942); cf. *Kaiser Steel Corp. v. Mullins, supra,* 455 U.S. at 77, 102 S.Ct. at 856.

But when we ask what is the federal rule on illegality as a contract defense, we find, alas, that the course of decision has not run completely true. Compare, for example, the hard line taken in government-contract cases such as *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 563– 66, 81 S.Ct. 294, 316–17, 5 L.Ed.2d 268 (1961), where the defense seems almost automatic (see also *Comdisco, Inc. v. United States,* 756 F.2d 569, 576 (7th Cir.1985); but cf. *United States v. Medico Industries, Inc.,* 784 F.2d 840, 845 (7th Cir.1986)), with the very soft line taken in antitrust cases such as *Kelly v. Kosuga, supra,* and *Delta Marina, Inc. v. Plaquemine Oil Sales, Inc.,* 644 F.2d 455, 458–59 (5th Cir.1981); but cf. *Kaiser Steel Corp. v. Mullins, supra,* 455 U.S. at 79–82, 102 S.Ct. at 857–59. The best generalization possible is that the defense of illegality, being in character if not origins an equitable and remedial doctrine, is not automatic but requires (as NIPSCO's counsel acknowledged at argument) a comparison of the pros and cons of enforcement. See *Jackson Purchase Rural Electric Coop. Ass'n v. Local Union 816, Int'l Brotherhood of Electrical Workers,* 646 F.2d 264, 267 (6th Cir.1981); cf. 15 Williston, A Treatise on the Law of Contracts § 1767, at pp. 264–65 (Jaeger 3d ed. 1972).

There are, after all, statutory remedies (e.g., cancellation of the lease or permit, see 30 U.S.C. § 188(b)) for violations of section 2(c); the question is whether there should be an additional, a judge-made, remedy. To decide whether there should be, we must consider the reciprocal dangers of overdeterrence and underdeterrence. Applied too strictly, the doctrine that makes the unenforceability of a contract an additional remedy for the violation of a statute can produce a disproportionately severe sanction; and the overdeterrence of illegality is as great a danger to freedom and prosperity as underdeterrence. The benefits of enforcing the tainted contract—benefits that lie in creating stability in contract relations and preserving reasonable expectations—must be compared with the costs in forgoing the additional deterrence of behavior forbidden by statute that is brought about by refusing to let the violator enforce the contract.

The balance in this case favors enforcement. This makes it irrelevant whether the district judge improperly instructed the

jury that in order to uphold the defense of illegality, it must find both that Carbon County was an alter ego of the railroad and that NIPSCO had been injured by the violation of section 2(c), or even whether the contract itself could be viewed as illegal under any interpretation of the statute. The interpretation of section 2(c) by the Departments of Justice and the Interior as embracing mere affiliates reversed the Department of the Interior's previous interpretation and was sufficiently unexpected to lead the Department to make the new interpretation prospective only—and the contract in this case had been signed years earlier. In any event the violation of section 2(c) (if any) was trivial given the attenuated linkage between the Union Pacific Railroad and Carbon County, and so far as appears completely harmless. No competitor of Union Pacific in the railroad business, and no competitor of Rocky Mountain Energy Company in the coal business who might be dependent on Union Pacific to transport his coal—no competitor of any member of the Union Pacific "family," however broadly defined—has complained that Carbon County is violating section 2(c). Nor has the Department of the Interior or the Department of Justice. Nor has any customer of any of the entities involved (however peripherally) in this lawsuit. Compare *National Licorice Co. v. NLRB,* 309 U.S. 350, 364–66, 60 S.Ct. 569, 577–78, 84 L.Ed. 799 (1940); *Republic Airlines, Inc. v. United Air Lines, Inc.,* 796 F.2d 526, 528 (D.C.Cir.1986). Only NIPSCO complains.

Section 2(c) is an anachronism—a regulatory statute on which the sun set long ago. It could serve as Exhibit A to Dean Calabresi's proposal that courts be empowered to invalidate obsolete statutes without having to declare them unconstitutional. See Calabresi, A Common Law for the Age of Statutes (1982). We do not believe that we have the power to declare a constitutional statute invalid merely because we, or for that matter everybody, think the statute has become obsolete. But the question in this case is not whether section 2(c) is enforceable but whether an alleged violation of the statute makes a contract unenforceable, and the obsolescence of the statute may be relevant to that determination.

NIPSCO does not argue that Carbon County's alleged violation of the statute hurt NIPSCO or that invalidating this contract under section 2(c) would help anyone, anywhere, at any time. The only consequence, other than to the parties to this suit, would be to throw a cloud of uncertainty over hundreds, perhaps thousands, of contracts for the supply of coal by firms affiliated with railroads, and to inject uncertainty into the contracting process generally. Persons negotiating contracts would have to worry about whether their contract might someday be found to have violated some old, little-known, and newly reinterpreted statute. Lawyers would benefit from the need to do more legal research before signing a contract, but no one else would. We conclude that the Mineral Lands Leasing Act is not a defense to the enforcement of this contract.

■ 3. The contract permits NIPSCO to stop taking delivery of coal "for any cause beyond [its] reasonable control ... including but not limited to ... orders or acts of civil ... authority ... which wholly or partly prevent ... the utilizing ... of the coal." This is what is known as a *force majeure* clause. See, e.g., *Northern Illinois Gas Co. v. Energy Coop., Inc.,* 122 Ill.App.3d 940, 949–52, 78 Ill.Dec. 215, 223–24, 461 N.E.2d 1049, 1057–58 (1984). NIPSCO argues that the Indiana Public Service Commission's "economy purchase orders" prevented it, in whole or part, from using the coal that it had agreed to buy, and it complains that the district judge instructed the jury incorrectly on the meaning and application of the clause. The complaint about the instructions is immaterial. The judge should not have put the issue of *force majeure* to the jury. It is evident that the clause was not triggered by the orders.

All that those orders do is tell NIPSCO it will not be allowed to pass on fuel costs to its ratepayers in the form of higher rates if

it can buy electricity cheaper than it can generate electricity internally using Carbon County's coal. Such an order does not "prevent," whether wholly or in part, NIPSCO from using the coal; it just prevents NIPSCO from shifting the burden of its improvidence or bad luck in having incorrectly forecasted its fuel needs to the backs of the hapless ratepayers. The purpose of public utility regulation is to provide a substitute for competition in markets (such as the market for electricity) that are naturally monopolistic. Suppose the market for electricity were fully competitive, and unregulated. Then if NIPSCO signed a long-term fixed-price fixed-quantity contract to buy coal, and during the life of the contract competing electrical companies were able to produce and sell electricity at prices below the cost to NIPSCO of producing electricity from that coal, NIPSCO would have to swallow the excess cost of the coal. It could not raise its electricity prices in order to pass on the excess cost to its consumers, because if it did they would buy electricity at lower prices from NIPSCO's competitors. By signing the kind of contract it did, NIPSCO gambled that fuel costs would rise rather than fall over the life of the contract; for if they rose, the contract price would give it an advantage over its (hypothetical) competitors who would have to buy fuel at the current market price. If such a gamble fails, the result is not *force majeure*.

This is all the clearer when we consider that the contract price was actually fixed just on the downside; it put a floor under the price NIPSCO had to pay, but the escalator provisions allowed the actual contract prices to rise above the floor, and they did. This underscores the gamble NIPSCO took in signing the contract. It committed itself to paying a price at or above a fixed minimum and to taking a fixed quantity at that price. It was willing to make this commitment to secure an assured supply of low-sulphur coal, but the risk it took was that the market price of coal or substitute fuels would fall. A *force majeure* clause is not intended to buffer a party against the normal risks of a contract. The normal risk of a fixed-price contract is that the market price will change. If it rises, the buyer gains at the expense of the seller (except insofar as escalator provisions give the seller some protection); if it falls, as here, the seller gains at the expense of the buyer. The whole purpose of a fixed-price contract is to allocate risk in this way. A *force majeure* clause interpreted to excuse the buyer from the consequences of the risk he expressly assumed would nullify a central term of the contract.

The Indiana Public Service Commission is a surrogate for the forces of competition, and the economy fuel orders are a device for simulating the effects in a competitive market of a drop in input prices. The orders say to NIPSCO, in effect: "With fuel costs dropping, and thus reducing the costs of electricity to utilities not burdened by long-term fixed-price contracts, you had better substitute those utilities' electricity for your own when their prices are lower than your cost of internal generation. In a freely competitive market consumers would make that substitution; if you do not do so, don't expect to be allowed to pass on your inflated fuel costs to those consumers." Admittedly the comparison between competition and regulation is not exact. In an unregulated market, if fuel costs skyrocketed NIPSCO would have a capital gain from its contract (assuming the escalator provisions did not operate to raise the contract price by the full amount of the increase in fuel costs, a matter that would depend on the cause of the increase). This is because its competitors, facing higher fuel costs, would try to raise their prices for electricity, thus enabling NIPSCO to raise its price, or expand its output, or both, and thereby increase its profits. The chance of this "windfall" gain offsets, on an ex ante (before the fact) basis, the chance of a windfall loss if fuel costs drop, though NIPSCO it appears was seeking a secure source of low-sulphur coal rather than a chance for windfall gains. If as is likely the Public Service Commission would require NIPSCO to pass on any capital gain from an advantageous contract to the

ratepayers (which is another reason for thinking NIPSCO wasn't after windfall gains—it would not, in all likelihood, have been allowed to keep them), then it ought to allow NIPSCO to pass on to them some of the capital loss from a disadvantageous contract—provided that the contract, when made, was prudent. Maybe it was not; maybe the risk that NIPSCO took was excessive. But all this was a matter between NIPSCO and the Public Service Commission, and NIPSCO did not seek judicial review of the economy purchase orders.

If the Commission had ordered NIPSCO to close a plant because of a safety or pollution hazard, we would have a true case of *force majeure*. As a regulated firm NIPSCO is subject to more extensive controls than unregulated firms and it therefore wanted and got a broadly worded *force majeure* clause that would protect it fully (hence the reference to partial effects) against government actions that impeded its using the coal. But as the only thing the Commission did was prevent NIPSCO from using its monopoly position to make consumers bear the risk that NIPSCO assumed when it signed a long-term fixed-price fuel contract, NIPSCO cannot complain of *force majeure*; the risk that has come to pass was one that NIPSCO voluntarily assumed when it signed the contract.

4. The district judge refused to submit NIPSCO's defenses of impracticability and frustration to the jury, ruling that Indiana law does not allow a buyer to claim impracticability and does not recognize the defense of frustration. Some background (on which see Farnsworth, Contracts §§ 9.5–9.7 (1982)) may help make these rulings intelligible. In the early common law a contractual undertaking unconditional in terms was not excused merely because something had happened (such as an invasion, the passage of a law, or a natural disaster) that prevented the undertaking. See *Paradine v. Jane*, Aleyn 26, 82 Eng. Rep. 897 (K.B.1647). Excuses had to be written into the contract; this is the origin of *force majeure* clauses. Later it came to be recognized that negotiating parties cannot anticipate all the contingencies that may arise in the performance of the contract; a legitimate judicial function in contract cases is to interpolate terms to govern remote contingencies—terms the parties would have agreed on explicitly if they had had the time and foresight to make advance provision for every possible contingency in performance. Later still, it was recognized that physical impossibility was irrelevant, or at least inconclusive; a promisor might want his promise to be unconditional, not because he thought he had superhuman powers but because he could insure against the risk of nonperformance better than the promisee, or obtain a substitute performance more easily than the promisee. See *Field Container Corp. v. ICC*, 712 F.2d 250, 257 (7th Cir.1983); Holmes, The Common Law 300 (1881). Thus the proper question in an "impossibility" case is not whether the promisor could not have performed his undertaking but whether his nonperformance should be excused because the parties, if they had thought about the matter, would have wanted to assign the risk of the contingency that made performance impossible or uneconomical to the promisor or to the promisee; if to the latter, the promisor is excused.

Section 2–615 of the Uniform Commercial Code takes this approach. It provides that "delay in delivery ... by a seller ... is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made...." Performance on schedule need not be impossible, only infeasible—provided that the event which made it infeasible was not a risk that the promisor had assumed. Notice, however, that the only type of promisor referred to is a seller; there is no suggestion that a buyer's performance might be excused by reason of impracticability. The reason is largely semantic. Ordinarily all the buyer has to do in order to perform his side of the bargain is pay, and while one can think of all sorts of reasons why, when the time

came to pay, the buyer might not have the money, rarely would the seller have intended to assume the risk that the buyer might, whether through improvidence or bad luck, be unable to pay for the seller's goods or services. To deal with the rare case where the buyer or (more broadly) the paying party might have a good excuse based on some unforeseen change in circumstances, a new rubric was thought necessary, different from "impossibility" (the common law term) or "impracticability" (the Code term, picked up in Restatement (Second) of Contracts § 261 (1979)), and it received the name "frustration." Rarely is it impracticable or impossible for the payor to pay; but if something has happened to make the performance for which he would be paying worthless to him, an excuse for not paying, analogous to impracticability or impossibility, may be proper. See Restatement, *supra*, § 265, comment a.

The leading case on frustration remains *Krell v. Henry*, [1903] 2 K.B. 740 (C.A.). Krell rented Henry a suite of rooms for watching the coronation of Edward VII, but Edward came down with appendicitis and the coronation had to be postponed. Henry refused to pay the balance of the rent and the court held that he was excused from doing so because his purpose in renting had been frustrated by the postponement, a contingency outside the knowledge, or power to influence, of either party. The question was, to which party did the contract (implicitly) allocate the risk? Surely Henry had not intended to insure Krell against the possibility of the coronation's being postponed, since Krell could always relet the room, at the premium rental, for the coronation's new date. So Henry was excused.

■ NIPSCO is the buyer in the present case, and its defense is more properly frustration than impracticability; but the judge held that frustration is not a contract defense under the law of Indiana. He relied on an Indiana Appellate Court decision which indeed so states, *Ross Clinic, Inc. v. Tabion*, 419 N.E.2d 219, 223 (Ind.App.1981), but solely on the basis of

an old decision of the Indiana Supreme Court, *Krause v. Board of Trustees*, 162 Ind. 278, 283–84, 70 N.E. 264, 265 (1904), that doesn't even discuss the defense of frustration and anyway precedes by years the recognition of the defense by American courts. At all events, the facts of the present case do not bring it within the scope of the frustration doctrine, so we need not decide whether the Indiana Supreme Court would embrace the doctrine in a suitable case.

For the same reason we need not decide whether a *force majeure* clause should be deemed a relinquishment of a party's right to argue impracticability or frustration, on the theory that such a clause represents the integrated expression of the parties' desires with respect to excuses based on supervening events; or whether such a clause either in general or as specifically worded in this case covers any different ground from these defenses; or whether a buyer can urge impracticability under section 2–615 of the Uniform Commercial Code, which applies to this suit. Regarding the last of these questions, although the text says "seller," Official Comment 9 to the section says that in some circumstances "the reason of the present section may well apply and entitle the buyer to the exemption," and many courts have done just that. See, e.g., *Nora Springs Coop. Co. v. Brandau*, 247 N.W.2d 744 (Iowa 1976); *Lawrance v. Elmore Bean Warehouse, Inc.*, 108 Idaho 892, 894, 702 P.2d 930, 932 (Idaho App.1985); *Northern Illinois Gas Co. v. Energy Coop., Inc., supra*, 122 Ill.App.3d at 954, 78 Ill.Dec. at 226, 461 N.E.2d at 1060. The rub is that Indiana has not adopted the "Official Comments" to the UCC. It has its own official comments, and they seem critical of Official Comment 9: "Comment 9 discusses 'exemption' for the buyer, but the text of the section is applicable only to sellers." Burns Ind.Stat.Ann. § 26–1–2–615, Ind. Comment. It may be, therefore, that buyers cannot use section 2–615 in Indiana. But it is not clear that this has substantive significance. Section 1–103 of the Uniform Commercial Code authorizes the courts to

apply common law doctrines to the extent consistent with the Code—this is the basis on which NIPSCO is able to plead frustration as an alternative defense to section 2–615; and the essential elements of frustration and of impracticability are the same. With section 2–615 compare Restatement, *supra*, §§ 261 (impossibility/impracticability) and 265 (frustration); and see *id.*, § 265, comment a. NIPSCO gains nothing by pleading section 2–615 of the Uniform Commercial Code as well as common law frustration, and thus loses nothing by a ruling that buyers in Indiana cannot use section 2–615.

Whether or not Indiana recognizes the doctrine of frustration, and whether or not a buyer can ever assert the defense of impracticability under section 2–615 of the Uniform Commercial Code, these doctrines, so closely related to each other and to *force majeure* as well, see *International Minerals & Chemical Corp. v. Llano, Inc.*, 770 F.2d 879, 885–87 (10th Cir.1985), cannot help NIPSCO. All are doctrines for shifting risk to the party better able to bear it, either because he is in a better position to prevent the risk from materializing or because he can better reduce the disutility of the risk (as by insuring) if the risk does occur. Suppose a grower agrees before the growing season to sell his crop to a grain elevator, and the crop is destroyed by blight and the grain elevator sues. Discharge is ordinarily allowed in such cases. See, e.g., *Matousek v. Galligan*, 104 Neb. 731, 178 N.W. 510 (1920); *Pearce-Young-Angel Co. v. Charles R. Allen, Inc.*, 213 S.C. 578, 50 S.E.2d 698 (1948); cf. *Olbum v. Old Home Manor, Inc.*, 313 Pa.Super. 99, 459 A.2d 757 (1983). The grower has every incentive to avoid the blight; so if it occurs, it probably could not have been prevented; and the grain elevator, which buys from a variety of growers not all of whom will be hit by blight in the same growing season, is in a better position to buffer the risk of blight than the grower is.

Since impossibility and related doctrines are devices for shifting risk in accordance with the parties' presumed intentions, which are to minimize the costs of contract performance, one of which is the disutility created by risk, they have no place when the contract explicitly assigns a particular risk to one party or the other. As we have already noted, a fixed-price contract is an explicit assignment of the risk of market price increases to the seller and the risk of market price decreases to the buyer, and the assignment of the latter risk to the buyer is even clearer where, as in this case, the contract places a floor under price but allows for escalation. If, as is also the case here, the buyer forecasts the market incorrectly and therefore finds himself locked into a disadvantageous contract, he has only himself to blame and so cannot shift the risk back to the seller by invoking impossibility or related doctrines. See Farnsworth, *supra*, at 680 and n. 18; White & Summers, Handbook of the Law Under the Uniform Commercial Code 133 (2d ed. 1980). It does not matter that it is an act of government that may have made the contract less advantageous to one party. See, e.g., *Connick v. Teachers Ins. & Annuity Ass'n*, 784 F.2d 1018, 1022 (9th Cir.1986); *Waegemann v. Montgomery Ward & Co.*, 713 F.2d 452, 454 (9th Cir. 1983). Government these days is a pervasive factor in the economy and among the risks that a fixed-price contract allocates between the parties is that of a price change induced by one of government's manifold interventions in the economy. Since "the very purpose of a fixed price agreement is to place the risk of increased costs on the promisor (and the risk of decreased costs on the promisee)," the fact that costs decrease steeply (which is in effect what happened here—the cost of generating electricity turned out to be lower than NIPSCO thought when it signed the fixed-price contract with Carbon County) cannot allow the buyer to walk away from the contract. *In re Westinghouse Electric Corp. Uranium Contracts Litigation*, 517 F.Supp. 440, 453 (E.D.Va.1981); cf. *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.*, 508 F.2d 283, 293 (7th Cir. 1974).

5. This completes our consideration of NIPSCO's attack on the damages judgment and we turn to Carbon County's cross-appeal, which seeks specific performance in lieu of the damages it got. Carbon County's counsel virtually abandoned the cross-appeal at oral argument, noting that the mine was closed and could not be reopened immediately—so that if specific performance (i.e., NIPSCO's resuming taking the coal) was ordered, Carbon County would not be able to resume its obligations under the contract without some grace period. In any event the request for specific performance has no merit. Like other equitable remedies, specific performance is available only if damages are not an adequate remedy, Farnsworth, *supra*, § 12.6, and there is no reason to suppose them inadequate here. The loss to Carbon County from the breach of contract is simply the difference between (1) the contract price (as escalated over the life of the contract in accordance with the contract's escalator provisions) times quantity, and (2) the cost of mining the coal over the life of the contract. Carbon County does not even argue that $181 million is not a reasonable estimate of the present value of the difference. Its complaint is that although the money will make the owners of Carbon County whole it will do nothing for the miners who have lost their jobs because the mine is closed and the satellite businesses that have closed for the same reason. Only specific performance will help them.

But since they are not parties to the contract their losses are irrelevant. Indeed, specific performance would be improper as well as unnecessary here, because it would force the continuation of production that has become uneconomical. Cf. Farnsworth, *supra*, at 817–18. No one wants coal from Carbon County's mine. With the collapse of oil prices, which has depressed the price of substitute fuels as well, this coal costs far more to get out of the ground than it is worth in the market. Continuing to produce it, under compulsion of an order for specific performance, would impose costs on society greater than the benefits. NIPSCO's breach, though it

gave Carbon County a right to damages, was an efficient breach in the sense that it brought to a halt a production process that was no longer cost-justified. See *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289 (7th Cir.1985); *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 63 (2d Cir.1985) (Friendly, J.). The reason why NIPSCO must pay Carbon County's loss is not that it should have continued buying coal it didn't need but that the contract assigned to NIPSCO the risk of market changes that made continued deliveries uneconomical. The judgment for damages is the method by which that risk is being fixed on NIPSCO in accordance with its undertakings.

With continued production uneconomical, it is unlikely that an order of specific performance, if made, would ever actually be implemented. If, as a finding that the breach was efficient implies, the cost of a substitute supply (whether of coal, or of electricity) to NIPSCO is less than the cost of producing coal from Carbon County's mine, NIPSCO and Carbon County can both be made better off by negotiating a cancellation of the contract and with it a dissolution of the order of specific performance. Suppose, by way of example, that Carbon County's coal costs $20 a ton to produce, that the contract price is $40, and that NIPSCO can buy coal elsewhere for $10. Then Carbon County would be making a profit of only $20 on each ton it sold to NIPSCO ($40–$20), while NIPSCO would be losing $30 on each ton it bought from Carbon County ($40–$10). Hence by offering Carbon County more than contract damages (i.e., more than Carbon County's lost profits), NIPSCO could induce Carbon County to discharge the contract and release NIPSCO to buy cheaper coal. For example, at $25, both parties would be better off than under specific performance, where Carbon County gains only $20 but NIPSCO loses $30. Probably, therefore, Carbon County is seeking specific performance in order to have bargaining leverage with NIPSCO, and we can think of no reason why the law should give it such

leverage. We add that if Carbon County obtained and enforced an order for specific performance this would mean that society was spending $20 (in our hypothetical example) to produce coal that could be gotten elsewhere for $10—a waste of scarce resources.

As for possible hardships to workers and merchants in Hanna, Wyoming, where Carbon County's coal mine is located, we point out that none of these people were parties to the contract with NIPSCO or third-party beneficiaries. They have no legal interest in the contract. Cf. *Local 1330, United Steel Workers of America v. United States Steel Corp.*, 631 F.2d 1264, 1279–82 (6th Cir.1980); *Serrano v. Jones & Laughlin Steel Co.*, 790 F.2d 1279, 1289 (6th Cir.1986). Of course the consequences to third parties of granting an injunctive remedy, such as specific performance, must be considered, and in some cases may require that the remedy be withheld. See *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir.1985); *Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir.1985); *Donovan v. Robbins*, 752 F.2d 1170, 1176 (7th Cir. 1985). The frequent references to "public interest" as a factor in the grant or denial of a preliminary injunction invariably are references to third-party effects. See, e.g., *Punnett v. Carter*, 621 F.2d 578, 587–88 (3d Cir.1980). But even though the formal statement of the judicial obligation to consider such effects extends to orders denying as well as granting injunctive relief, see, e.g., *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir.1982) (en banc), the actuality is somewhat different: when the question is whether third parties would be injured by an order denying an injunction, always they are persons having a legally recognized interest in the lawsuit, so that the issue really is the adequacy of relief if the injunction is denied. In *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618 (5th Cir.1985), for example, a public utility sought a preliminary injunction against alleged overcharges by a supplier. If the injunction was denied and later the utility got damages, its customers would be entitled to refunds; but for a variety of reasons explained in the opinion, refunds would not fully protect the customers' interests. The customers were the real parties in interest on the plaintiff side of the case, and their interests had therefore to be taken into account in deciding whether there would be irreparable harm (and how much) if the preliminary injunction was denied. See *id.* at 623–26. Carbon County does not stand in a representative relation to the workers and businesses of Hanna, Wyoming. Treating them as real parties in interest would evade the limitations on the concept of a third-party beneficiary and would place the promisor under obligations potentially far heavier than it had thought it was accepting when it signed the contract. Indeed, if we are right that an order of specific performance would probably not be carried out—that instead NIPSCO would pay an additional sum of money to Carbon County for an agreement not to enforce the order—it becomes transparent that granting specific performance would make NIPSCO liable in money damages for harms to nonparties to the contract, and it did not assume such liability by signing the contract. Cf. *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 159 N.E. 896 (1928).

Moreover, the workers and merchants in Hanna assumed the risk that the coal mine would have to close down if it turned out to be uneconomical. The contract with NIPSCO did not guarantee that the mine would operate throughout the life of the contract but only protected the owners of Carbon County against the financial consequences to them of a breach. As Carbon County itself emphasizes in its brief, the contract was a product of the international oil cartel, which by forcing up the price of substitute fuels such as coal made costly coal-mining operations economically attractive. The OPEC cartel is not a source of vested rights to produce substitute fuels at inflated prices.

6. The last issue is the judge's refusal to force NIPSCO to post a $181 million

bond as a condition of obtaining a stay of execution of the damage judgment pending NIPSCO's appeal. The issue is not moot, because our decision upholding the judgment will not become final until NIPSCO has exhausted all its rights of further review, and meanwhile Carbon County will continue to incur whatever risk is created by the absence of a bond.

 There are two grounds for rejecting Carbon County's appeal. The first is the cross-appeal, which seeks to substitute specific performance for the damage judgment. A party that it trying to obtain specific performance in lieu of damages cannot at the same time attempt to execute a damage judgment. *Bronson v. La Crosse & Milwaukee R.R.*, 68 U.S. 405, 409–10, 1 Wall. 405, 409–10, 17 L.Ed. 616 (1863); *Price v. Franklin Investment Co.*, 574 F.2d 594, 597 (D.C.Cir.1978). Yet the reason for an appeal bond is to give the plaintiff security while execution is postponed. If he does not want to execute the damage judgment, because he hopes for something better, he gives up nothing by waiting till the appeals are over with before executing the damage judgment—there is no quid for the quo of a bond paid for by the defendant-appellant. Although supersedeas bonds have sometimes been granted in such cases, see *New York v. Shore Realty Corp.*, 763 F.2d 49, 51 (2d Cir.1985); *Mid-Jersey Nat'l Bank v. Fidelity-Mortgage Investors*, 518 F.2d 640, 642 (3d Cir.1975); *Knapp v. Kinsey*, 249 F.2d 797, 800 (6th Cir.1957), none of the cases discusses the propriety of doing so. Lacking omniscience, we hesitate to say that requiring a bond would never be proper in such a case, but there would have to be a good reason for it and Carbon County has provided none.

Second, as explained in *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 786 F.2d 794 (7th Cir.1986), it is a misreading of Rule 62(d) of the Federal Rules of Civil Procedure to suggest that an appellant who wants to stay execution pending appeal must post a bond. The rule requires him to post a bond if he wants an automatic stay, but not if he is content to throw himself on the district judge's discretion. See also *Lightfoot v. Walker*, 797 F.2d 505, 506 (7th Cir.1986). An appeal bond usually costs one percent of the amount secured, which in the case of a $181 million judgment is almost $2 million. That is not small change; and if the district judge is satisfied that the expenditure is unnecessary to protect the appellee, he does not have to insist that it be spent. NIPSCO has assets of more than $4 billion, revenues of almost $2 billion a year, and a net worth of more than $1 billion. A public utility, it is in no financial jeopardy, it is not about to place its assets beyond the reach of this judgment creditor, and it is, in short, good for the $181 million. Should NIPSCO's ability to pay begin to deteriorate, Carbon County can always petition the district judge for supplementary relief; he has even required periodic reports from NIPSCO to make it easier to monitor the company's financial health.

To summarize, the appeal from the grant of the preliminary injunction is dismissed as moot; the other orders appealed from are affirmed. No costs will be awarded in this court, since we have turned down Carbon County's appeals as well as NIPSCO's.

So Ordered.