# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2693

WISCONSIN ELECTRIC POWER COMPANY,

*Plaintiff-Appellant,*

*v.*

UNION PACIFIC RAILROAD COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06-C-515—**Rudolph T. Randa**, *Chief Judge.*

ARGUED JANUARY 7, 2009—DECIDED MARCH 2, 2009

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* WEPCO, an electric utility that is the plaintiff in this diversity suit for breach of contract (governed by Wisconsin law), appeals from the grant of summary judgment to the defendant, the Union Pacific railroad. The contract was for the transportation of coal to WEPCO from coal mines in Colorado between the beginning of 1999 and the end of 2005. The appeal presents

two issues: whether a force majeure clause in the contract authorized the railroad to increase its rate for shipping the coal, and whether the railroad breached its duty of good-faith performance of its contractual obligations by failing to ship the tonnage requested by WEPCO on railcars supplied by the railroad.

The doctrine of impossibility in the common law of contracts excuses performance when it would be unreasonably costly (and sometimes downright impossible) for a party to carry out its contractual obligations. If the doctrine is successfully invoked, the contract is rescinded without liability. The standard explanation for the doctrine is that nonperformance is not a breach if it is caused by a circumstance "the non-occurrence of which was a 'basic assumption on which the contract was made.'" *Restatement (Second) of Contracts*, introductory note to ch. 11, preceding § 261 (1981), quoting UCC § 2-615. But this explanation leaves unexplained why parties to a contract would have assumed that a condition would not occur that has occurred. Was it just a lack of foresight? Or is the idea behind the doctrine, rather, that the parties, had they negotiated with reference to the contingency that has come to pass and has made performance infeasible or fearfully burdensome, would have excused performance? The latter is the more promising line of inquiry, and is the line we took in *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265, 276-78 (7th Cir. 1986), where we said that "the proper question in an 'impossibility' case is . . . whether [the promisor's] nonperformance should be excused because the parties, if they had thought about the matter, would

have wanted to assign the risk of the contingency that made performance impossible or uneconomical to the promisor or to the promisee; if to the latter, the promisor is excused." *Id*. at 276. "Impossibility" is thus a doctrine "for shifting risk to the party better able to bear it, either because he is in a better position to prevent the risk from materializing or because he can better reduce the disutility of the risk (as by insuring) if the risk does occur." *Id*. at 277; see also *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1016-17 (D.C. Cir. 1987).

Liability for breach of contract is strict, *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 543-44 (1903) (Holmes, J.); *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 956-57 (7th Cir. 1982); *Restatement*, *supra*, introductory note to ch. 11, preceding § 261, which makes the performing party an insurer against the consequences of his failing to perform, even if the failure is not his fault. But formal insurance contracts contain limits of coverage, and the impossibility doctrine in effect caps the "insurance" coverage that strict liability for breach of contract provides. Cf. *Northern Indiana Public Service Co. v. Carbon County Coal Co., supra*, 799 F.2d at 277. The analogy is to a provision in a fire insurance contract that excepts from coverage a fire caused by an act of war. So it is no surprise that in *Allanwilde Transport Corp. v. Vacuum Oil Co.*, 248 U.S. 377, 385-86 (1919), the doctrine of impossibility was successfully invoked when a wartime embargo prevented the performance of a shipping contract because the ship could not complete its voyage. See also *Israel v. Luckenbach S.S. Co.*, 6 F.2d 996 (2d Cir. 1925).

Parties can, however, contract around the doctrine, because it is just a gap filler, *First National Bank v. Atlantic Tele-Network Co.*, 946 F.2d 516, 521 (7th Cir. 1991); *United States v. General Douglas MacArthur Senior Village, Inc.*, 508 F.2d 377, 381 (2d Cir. 1974); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 9.6, p. 643 (3d ed. 2004)—a guess at what the parties would have provided in their contract had they thought about the contingency that has arisen and has prevented performance or made it much more costly. As Holmes explained, "the consequences of a binding promise at common law are not affected by the degree of power which the promisor possesses over the promised event . . . . In the case of a binding promise that it shall rain to-morrow, the immediate legal effect of what the promisor does is, that he takes the risk of the event, within certain defined limits, as between himself and the promisee. He does no more when he promises to deliver a bale of cotton." O.W. Holmes, Jr., *The Common Law* 299-300 (1881); see *Field Container Corp. v. ICC*, 712 F.2d 250, 257 (7th Cir. 1983). The key is *binding* promise. To defeat the application of the doctrine of impossibility the contract must state that the promisor must pay damages even if he commits a breach that could not have been prevented at a reasonable cost.

Modern contracting parties often do contract around the doctrine, though not by making the promisor liable for any and every failure to perform—rather by specifying the failures that will excuse performance. The clauses in which they do this are called force majeure ("superior force") clauses. The name suggests a purpose similar to that of the impossibility doctrine. But it is

essential to an understanding of this case that a force
majeure clause must always be interpreted in ac-
cordance with its language and context, like any other
provision in a written contract, rather than with
reference to its name. It is not enough to say that the
parties must have meant that performance would be
excused if it would be "impossible" within the meaning
that the word has been given in cases interpreting the
common law doctrine. *Perlman v. Pioneer Ltd. Partnership*,
918 F.2d 1244, 1248 n. 5 (5th Cir. 1990); *PPG Industries,
Inc. v. Shell Oil Co.*, 919 F.2d 17, 18-19 (5th Cir. 1990);
Williams Cary Wright, "Force Majeure Delays," 26 *Con-
struction Lawyer* 33, 33 (2006); see also *Gulf Oil Corp. v.
FPC*, 563 F.2d 588, 601-02 (3d Cir. 1977).

The provision at issue in this case does not specify
circumstances that would make performance impossible
or infeasible in any sense, and does not excuse the per-
forming party (the railroad) from performing the con-
tract. The provision is part of Article XI of the contract, and
some of the other provisions in the article do specify
contingencies that would excuse performance, including
certain "acts of God." But the provision at issue merely
provides that if the railroad is prevented by "an event of
Force Majeure" from reloading its empty cars (after it has
delivered coal to WEPCO) with iron ore destined for
Geneva, Utah, it can charge the higher rate that the con-
tract makes applicable to shipments that do not involve
backhauling. Cf. 2 Farnsworth, *supra*, § 9.1, p. 585; 14 *Corbin
on Contracts* § 74.19, p. 113 (Joseph M. Perillo ed. 2008). For
example, the rate for coal shipped from one of the Colo-
rado mines to WEPCO was specified as $13.20 per ton if

there was a backhaul shipment but $15.63 if there was not. The reason for the higher rate, obviously, was that if the railroad's cars were empty on the trip back to Colorado, the railroad would obtain no revenue on that trip; it would be underutilizing the cars.

The iron ore that the railroad's freight train would have picked up in Minnesota on its way back was intended for a steel mill in Utah owned by the Geneva Steel company. (The mill had been built during World War II well inland because of fear that the Japanese might attack the West Coast.) The company was bankrupt when the parties signed the contract. It was still operating, but obviously might cease to do so; hence the provision. Why the parties used the term "force majeure," rather than simply providing that the railroad could charge the higher rate if the steel company stopped buying iron ore, has not been explained. More careful drafting might have averted this lawsuit.

In November 2001 the steel mill shut down, never to reopen. It was closed for good in February 2004. A couple of months after that final closing the railroad wrote WEPCO to declare "an event of Force Majeure" and that henceforth it would be charging WEPCO the higher rate applicable to shipments without a backhaul. It did not attempt to make the rate change retroactive. Had it invoked the force majeure clause when the steel mill first shut down, WEPCO would have incurred an extra $7 million in shipping charges between then and the belated declaration of force majeure.

Despite this windfall, WEPCO argues that the railroad broke the contract by invoking the force majeure clause

when it did. The fact that the railroad didn't invoke the clause earlier shows that the shutting down of the steel mill did not prevent the railroad from charging the low, backhaul rate. Well of course not; it is never "impossible" to offer a discount. But what the contract says is that the railroad may charge the higher rate if it is prevented from reloading its cars, rather than if it is prevented from charging a lower rate.

WEPCO points out that Article XI requires prompt notification of an event of force majeure and also requires the invoker to make reasonable efforts to eliminate or abate the force majeure. It argues that the railroad violated its duty of prompt notice and by doing so waived its right to declare a force majeure. But another clause in the contract provides that a failure of a party to insist on a right that the contract confers on it shall not be deemed a waiver. That scotches WEPCO's argument except insofar as it wishes to complain not about the declaration of force majeure as such but simply about the breach of the duty of prompt notice.

A "no waiver" clause is appropriate in a complex multi-year contract that imposes (as we will see) duties of performance on both parties, as distinct from a simple sales contract in which one party performs and the other pays. If a party lost a contract right through waiver by failing to assert it as soon as it was violated, the process of amicable adjustment of contingencies bound to arise in the course of performing the contract would be impeded by premature assertion of legal claims. *Monarch Coaches, Inc. v. ITT Industrial Credit*, 818 F.2d 11, 13 (7th

Cir. 1987); *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 85-86 (2d Cir. 1998); *S.H.V.C. v. Roy*, 450 A.2d 351, 353 (Conn. 1982); Sean J. Young, "Reaping the Benefits of 'Forbearance' in Contract Through the Doctrine of Election," 9 *Florida Coastal Law Rev*. 65, 85-89 (2007) ("the waiver regime discourages forbearance because it gives the injured party a strong incentive to object, which necessarily rules out forbearance"); Jason Scott Johnston, "The Return of Bargain: An Economic Theory of How Standard-Form Contracts Enable Cooperative Negotiation Between Businesses and Consumers," 104 *Mich. L. Rev*. 857, 891 (2006). When the parties were getting along and there was some possibility that Geneva Steel would not be liquidated, the railroad was disinclined to stand on its rights. But at about the same time that the steel mill closed irrevocably, WEPCO threatened the railroad with a lawsuit over alleged poor service. Since WEPCO was standing on its claimed rights, the railroad decided to stand on its own. We cannot see anything wrong in that. Cf. 2 Farnsworth, *supra,* § 8.19a, p. 543.

It is true that while nonwaiver clauses are no longer unenforceable, e.g., *Roboserve, Inc. v. Kato Kagaku Co., Ltd*., 78 F.3d 266, 277 (7th Cir. 1996); *DeValk Lincoln Mercury, Inc. v. Ford Motor Co*., 811 F.2d 326, 334 (7th Cir. 1987); *Klipsch, Inc. v. WWR Technology, Inc*., 127 F.3d 729, 735-36 (8th Cir. 1997), there is still some authority for treating them as themselves waivable. E.g., *Exxon Corp. v. Crosby-Mississippi Resources, Ltd*., 40 F.3d 1474, 1491-92 (5th Cir. 1995); *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869 (10th Cir. 1981); but see *DeValk Lincoln*

*Mercury, Inc. v. Ford Motor Co., supra*, 811 F.2d at 334. But if that notion were taken literally, no-waiver clauses would be worthless. Fortunately, it is not taken literally; the waiver of a no-waiver clause must be "proved by clear and convincing evidence," *Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 776 F.2d 198, 202 (7th Cir. 1985); see also *Roboserve, Inc. v. Kato Kagaku Co., Ltd., supra*, 78 F.3d at 277-78, a condition not fulfilled here.

Granted, the cases that we have cited are not Wisconsin cases; the only case that we can find from Wisconsin is an unpublished, nonprecedential intermediate appellate opinion, *121 Langdon Street Group v. Heiligman*, 2005 WL 613493 (Wis. App. Mar. 17, 2005), which, however, for what it is worth, rules that no-waiver clauses are enforceable and does not suggest any limitations on their enforceability.

A claim arising from breach of the prompt-notice clause might have merit were there doubt whether there really had been an event of force majeure. The argument would be that for want of receiving prompt notice WEPCO had lost an opportunity to investigate and discover that there was no such event. But WEPCO does not suggest that the steel mill may not really have shut down, for good as it later turned out, in November of 2001. It does argue that if notified promptly of the shut down it might have explored alternative ways of obtaining coal at a rate below the higher, no-backhaul rate. The contract required WEPCO to ship specified minimum tonnages of coal by the railroad, but it shipped more, and conceivably would have shipped

less—perhaps making up the difference from some other coal mine—had it been able to find a cheaper rate from some other railroad. But there is no evidence that such alternatives ever existed, or, more to the point, existed in 2001 but evaporated by 2004.

Not only has WEPCO failed to show any detrimental reliance on the failure to receive prompt notice of the higher rate; it refuses, contrary to the most elementary principles of damages, to acknowledge that had it relied to its detriment any damages caused by that reliance would have to be reduced by $7 million. That is the cost WEPCO saved as a result of the railroad's forbearance to invoke the force majeure clause at the earliest possible opportunity.

WEPCO argues that the railroad made no reasonable effort to abate the force majeure, as the contract required. The railroad did not explore the possibility of finding some other commodity, besides iron ore, to ship west. (It couldn't be iron ore, because Geneva Steel was the only buyer of iron ore served by the railroad.) But that is not what the duty of abatement contemplated. The event of force majeure—the event that the railroad was required to exert reasonable efforts to abate—was an event that prevented the railroad from reloading its cars with iron ore for the trip back west.

Had Geneva Steel owed the railroad some small amount of money and begged it to forbear to sue to collect because that would force the company into bankruptcy, forbearance to sue might conceivably be a reasonable effort to avoid the railroad's having to send its trains

west without a backhaul, and therefore an effort that the railroad was obligated to undertake. But there is no suggestion of that. WEPCO's argument, rather, is that the railroad should have looked for something else to carry back in its trains. But that would have placed on the railroad a burdensome open-ended duty to explore the possibility of reconfiguring its operations, which would have required searching for, finding, and making contracts with other shippers and perhaps purchasing or renting railcars optimized to carry those shippers' commodities. Disputes over the adequacy of the railroad's efforts would present unmanageable issues for litigation. This cannot have been what the abatement clause envisaged.

The point about unmanageability goes far to resolve the other issue presented by the appeal. Article VI of the contract required WEPCO to notify the railroad monthly of how many tons of coal (within the maximum tonnage specified by the contract) it wanted shipped the next month, and "the parties agree to make good faith reasonable efforts to meet the Monthly Shipping Schedule." Nowhere did the contract require the railroad to comply with the schedule; it merely had to make, in good faith, a reasonable effort to do so. Article VII did require the railroad to transport tonnages specified by WEPCO, but only if WEPCO supplied the railcars for the shipment, and it did not; the railroad did; during the period in which WEPCO charges that the railroad was acting in bad faith, the railroad transported in its own cars 84 percent of the total shipments of coal requested by WEPCO.

Not enough, argues WEPCO. Without specifying the minimum percentage that would have demonstrated good faith, it argues that it would have exceeded 90 percent. It says that the railroad shipped less because it had other customers who paid higher rates. WEPCO invokes the legal duty of good faith in the performance of a contract. The duty entails the avoidance of conduct such as "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Foseid v. State Bank*, 541 N.W.2d 203, 213 (Wis. App. 1995).

But the duty of good faith does not require your putting one of your customers ahead of the others, even if the others are paying you more. "Parties are not prevented from protecting their respective economic interests." John Edward Murray, Jr., *Murray on Contracts* § 90, p. 501 (4th ed. 2001). As we explained, interpreting Wisconsin law in *Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991), "even after you have signed a contract, you are not obliged to become an altruist toward the other party and relax the terms if he gets into trouble in performing his side of the bargain."

Another customer of the railroad might be paying a very high rate because it had an urgent need for service—so could *it* charge the railroad with bad faith if it had a contract similar to the railroad's contract with WEPCO and the railroad told it, very sorry, but we cannot serve you; it is not that we love you less, but that

we love WEPCO more? "A duty of good faith does not mean that a party vested with a clear right is obligated to exercise that right to its own detriment for the purpose of benefiting another party to the contract." *Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 505 (Utah 1980). And it certainly doesn't mean exercising that right to the detriment of another party with which it has a contract. Again WEPCO invites the court to undertake an unmanageable judicial task—that of working out an equitable allocation of Union Pacific's railcars among its various customers. Cf. *Exacto Spring Corp. v. Commissioner*, 196 F.3d 833, 838 (7th Cir. 1999); *Micro Data Base Systems, Inc. v. Nellcor Puritan Bennett, Inc.*, 165 F.3d 1154, 1156 (7th Cir. 1999).

AFFIRMED.