In the

# United States Court of Appeals
### For the Seventh Circuit

———————

Nos. 13-3535, 13-3730

TMG KREATIONS, LLC, *et al.*,

*Plaintiffs/Appellants, Counterdefendants/Cross-Appellees*,

*v.*

PETER SELTZER; FLAT BE CO. LTD.; *et al.*,

*Defendants/Appellees, Counterplaintiffs/Cross-Appellants*.

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 5018 —**Samuel Der-Yeghiayan**, *Judge*.

———————

ARGUED SEPTEMBER 18, 2014 — DECIDED NOVEMBER 13, 2014

———————

Before WOOD, *Chief Judge*, and POSNER and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*. This is a complex commercial case, involving a number of claims and counterclaims and no fewer than eight parties. Five of the eight, however, are affiliated with the three named in the caption, and can be ignored. The lawyers, drowning in detail, have done a poor job of presenting the facts and issues in an orderly, compact,

and comprehensible form. We shall simplify for the sake of clarity.

The basis of federal jurisdiction is diversity of citizenship. The parties agree that Illinois law supplies the applicable substantive doctrines. The district court dismissed the entire litigation on cross-motions for summary judgment, and both sides have appealed, each arguing that the evidence does not support the grant of summary judgment to the other side. One side includes Peter Seltzer and a company partially owned by him called Kashwere USAJPN LLC, plus a company called Flat Be that is allied with him though not an affiliate; it is owned by a Japanese man named Hiroshi Miyakawa. We'll generally refer to Seltzer plus his company simply as "Seltzer," although we'll have occasion to mention Kashwere USAJPN LLC (we'll call it just "USAJPN" for simplicity) separately. The other side of the litigation consists of two affiliated companies plus two of their owners. We'll call that entire group "TMG."

In or about 1999 Peter Seltzer registered the word "Kashwére" as a trademark for attractive and comfortable soft goods, such as bathrobes, shawls and other apparel, and bedspreads, that he intended to manufacture out of cotton or other materials by a production process that originated in the eighteenth century. Yarn or fabric manufactured in accordance with that process (which produces a fuzzy surface on the fabric) is called "chenille." Here is a photo of a chenille bedspread:



In 2009, having encountered severe financial problems, Seltzer decided to sell his company's principal assets, including the Kashwére trademark, to two of the company's principal officers. They formed a company, TMG, which bought the assets from Seltzer the following year. As part of the deal TMG granted Seltzer an exclusive license to sell chenille products under the Kashwére name in Japan, though only through Flat Be, which in 2006 Seltzer had made the exclusive distributor of Kashwére products in Japan. And so Seltzer—formerly the world's only producer of chenille products under the Kashwére label—was displaced by TMG except in the Japanese market.

As part of the same transaction that confined his Kashwére business to Japan, Seltzer entered into a "noncompete" agreement with TMG that forbade him to try to persuade any of his customers to reduce its purchases of chenille products from TMG or to disparage TMG or its

principals. It should really be called a "non-solicitation" or "non-disparagement" agreement, but "non-compete agreement" is the parties' name for it so that's what we'll call it.

Thus when the dust settled there was an asset-purchase agreement between TMG and Seltzer, an exclusive license granted by TMG to Seltzer covering the Japanese market for Kashwére products, and a non-compete agreement between the two. The agreements left neither party with a world market, though TMG got the lion's share. In this litigation each accuses the other of wanting the whole world and engaging in nefarious practices to oust the other.

We begin with TMG's claims, of which there are two sets. The main claim in the first set is that Seltzer violated the terms of his exclusive license to sell chenille products under the Kashwére mark in Japan. He created the company that he called USAJPN and transferred to it "all rights, title, and interests" conferred by his license from TMG. USAJPN has no other significant assets—no employees, no office, and no revenue—and apparently does nothing at all. Seltzer gave Miyakawa, the owner of Flat Be, Seltzer's exclusive Japanese distributor, a 10 percent interest in USAJPN—why we don't know. Flat Be proceeded to register trademarks for Kashwére products in Japan. It almost certainly did that as a licensee of Seltzer. Remember that Miyakawa owns Flat Be and that Seltzer gave him a 10 percent interest in USAJPN, the Seltzer company whose only significant asset is Seltzer's license. It appears that the sole function of USAJPN was to create an appearance of distance between Seltzer and Flat Be. Although USAJPN is the nominal license holder, Flat Be pays royalties to Seltzer rather than to USAJPN. Seltzer's business in Japan had been delegated entirely to Flat Be,

making it TMG's actual licensee of Kashwére products sold in Japan. Seltzer received a share of Flat Be's revenues, doubtless as compensation for the transfer to it of TMG's license authorizing Seltzer to sell Kashwére products in Japan.

By transferring his license to Flat Be, Seltzer violated his deal with TMG by failing to obtain TMG's permission for the transfer. He points out that there was no "written offer" by Flat Be for the license, and that his license agreement with TMG forbade him to transfer his TMG license to a third party in response to a *written* offer without giving TMG a right of first refusal. But this can't mean that Seltzer was authorized to transfer the license without consulting TMG as long as the offer he received was oral; what sense could that make? The agreement specified a written offer so that TMG would know what Seltzer wanted to do with the license and knowing this could decide whether to permit the license to be transferred. That the offer be written was an implicit term of the parties' agreement.

Nor was Flat Be authorized to register a Kashwére trademark; only TMG was. Seltzer's license from TMG states that the "Licensee shall not apply to register as a trademark the Licensed Mark or any other trademarks owned by Licensor." Seltzer argues that he didn't need TMG's permission to transfer his license because the license stated that "the right of refusal … shall not apply if the proposed third party is an entity in which Peter Seltzer owns a majority of the equity ownership or maintains managerial control," USAJPN was such an entity. But Seltzer's assignment of the TMG license to USAJPN provided that "Flat Be … hereby will receive 100% of all rights, protections, and privileges as set forth in the Kashwere Japan License … and share equally in all these

rights, protections and privileges as per this agreement." Even though Seltzer owned a majority interest in USAJPN, he needed TMG's approval for the further transfer of rights to Flat Be.

Besides making and selling Kashwére products authorized by the license, Flat Be created a line of fabrics that it sells, which it calls Kashwére Re but which is not chenille. Seltzer's license does not authorize the sale under the Kashwére name of products that are not chenille, but he argues that one of TMG's owners approved the Kashwére Re project. His principal evidence is an email chain in which a representative of Flat Be told the TMG owner that Flat Be was developing new products unlike the Kashwére products sold theretofore, and the TMG owner responded by asking for a list of all the new products; neither party referred to the Kashwére Re line. Other evidence concerning the alleged approval was in conflict; a trial would be needed to resolve the conflict.

And finally even if as it appears USAJPN was merely a conduit through which Seltzer's license from TMG passed to Flat Be, before the completion of the passage USAJPN held the license and failed to comply with a term that requires the licensee, if it uses the Kashwére mark as part of its corporate name, to disclose that it is a licensee of TMG—and recall that the full name of USAJPN is "Kashwere USAJPN LLC."

On the basis of what appears to be multiple violations by Seltzer of the license granted him to sell Kashwére products in Japan, TMG asked the district court to order the license cancelled or alternatively to enjoin future violations and award TMG damages. The district judge refused, but on unconvincing grounds. He ruled that Flat Be, because it had

been Seltzer's exclusive distributor in Japan before TMG was created and Seltzer became TMG's licensee in the Japanese market, could continue as before. And indeed the license agreement "confirmed and approved" the 2006 license that Seltzer had issued to Flat Be. But Flat Be didn't continue as before. It became a licensee of TMG, replacing Seltzer. That switch wasn't authorized. Moreover, while as Seltzer's exclusive distributor Flat Be had been authorized to place the Kashwére mark on the Kashwére products that it sold on Seltzer's behalf, it had no authority to affix the mark to products that were not chenille; indeed doing so was a trademark violation as well as a contractual violation. And a jury could find that Seltzer had approved the Kashwére Re project. For such conduct both Seltzer and Flat Be (which remember is also a defendant) would be liable to TMG for breach of contract and violation of trademark.

The evidence of these license violations was strong, and the ground on which the district judge rejected it unsound. Seltzer's motion for summary judgment should have been denied.

It's a separate question whether, should TMG prevail on remand, the proper remedy would be cancellation of Seltzer's license, one of the alternatives sought by TMG. Cancellation would drive Seltzer out of the Japanese market for products sold under the Kashwére name—his only market— and so probably destroy the business without which there might never have been a TMG. That would be a draconian remedy. TMG has asked in the alternative that the court enjoin Seltzer and his affiliates, and Flat Be and any successors to it or to him as distributors of Kashwére products, from violating Seltzer's license from TMG. Should the case reach

the remedy stage the district court should give careful consideration to this alternative, gentler remedy, but should make clear that any further violations by Seltzer will result in the cancellation of its license. An award of damages for past harm to TMG's business caused by Seltzer's and Flat Be's violations would also be a proper form of relief.

We move to the second set of claims by TMG. These are claims, two in number, that Seltzer violated the non-compete agreement with TMG. For unexplained reasons the district judge did not discuss the first of these claims, though he implicitly rejected it in dismissing all the claims and counterclaims in the litigation. That first claim, for which there is compelling evidence, is that Seltzer made strenuous efforts to damage TMG's business—efforts that not only violated the non-compete agreement but could well support a tort action for defamation and product disparagement. Illustrative is an email that Seltzer sent to the person who was shortly to become TMG's liaison with Asian manufacturers of TMG's Kashwére products, stating that TMG was engaged in illegal activities, sold inferior chenille products under the Kashwére name in Japan, and "has a long history of lying." The first two statements are false; the truth or falsity of the third remains to be determined. In another email to the soon-to-be liaison Seltzer said that he was seeking an injunction against TMG that if granted might prevent the Asian manufacturers from being paid for the chenille products they were making for and selling to TMG. There is also evidence that Seltzer tried to sell chenille products in China that would compete with the chenille products that TMG sold there, in further violation of the non-compete agreement.

TMG's second claim in this set involves the settlement of a suit brought by USAJPN and Flat Be against TMG and fourteen distributors of TMG's Kashwére products. The suit had charged the distributors with infringing Seltzer's exclusive right to serve the Japanese market, by reselling in Japan the Kashwére products they bought from TMG. The suit ended in a settlement, to which TMG was not a party, whereby with one exception each distributor agreed to stop buying Kashwére products from TMG.

The suit had, as we'll see shortly and as the district judge noted, no merit. But as the judge concluded, it was not frivolous; and the non-compete agreement was not intended to strip Seltzer of all rights to defend himself against possibly unlawful activities by TMG. The settlement is another matter. TMG was not a party to it, is therefore not bound by it, and it went well beyond what Seltzer could reasonably demand by way of protection against illegal activities of TMG. The settlement would have required TMG to reconstitute its chain of distribution, something difficult to do because any new distributors would have to worry about being sued by Seltzer, like the old ones, especially if they resold Kashwére products in Japan, though as we'll see they're not forbidden by Seltzer's license to do so.

We turn to Seltzer's cross-appeal, which presents two claims. One is a mirror image of TMG's claim that Seltzer violated the non-compete agreement. It is that TMG knew that some of its distributors were reselling in Japan, knew that the Kashwére products they were reselling were inferior in quality to Kashwére products made and sold by Flat Be, and assisted these distributors by providing them with "hang tags" in Japanese to affix to the Kashwére products

they were selling in Japan, and that as result of these she-nanigans the resales violated both Seltzer's exclusive right to market such products in Japan and the trademarks that Flat Be had obtained.

Of course Seltzer may have lost his rights under the license by virtue of the maneuvers with Flat Be that we discussed earlier; and Flat Be had no right to affix the Kashwére trademark to its Kashwére Re products, since they are not chenille. It claims, however, that the Kashwére chenille goods (as distinct from the Kashwére Re goods) that it sells in Japan are actually superior to Kashwére products that TMG distributors are reselling in Japan because Flat Be's products have a higher thread count and Flat Be maintains a stricter system of quality control. That's neither here nor there; what is critical is that nothing in Seltzer's license required TMG to prevent resales in Japan by its distributors. Seltzer could have negotiated for including in the exclusive license a provision requiring TMG to forbid its distributors to resell to Japanese customers, but didn't do so. The only express limitation on distribution is the prohibition (with an irrelevant exception) against TMG's making *direct* sales to Japanese customers. The existence of that limitation reinforces the conclusion that TMG was placed under no duty to prevent its distributors from selling in Japan. It suggests that the parties negotiated with respect to distribution but not with respect to resales by distributors.

Express limitations on resale by distributors are common. And Seltzer must have known that purchasers of TMG's chenille products elsewhere in the world might resell in the large Japanese market and that if they did so this would reduce Seltzer's own sales through Flat Be. It's true that before

he sold his company to TMG, Seltzer had interpreted his distribution agreement with Flat Be—which remember preceded the license agreement with TMG—to forbid distributors of Kashwére products to resell in Japan, that is, in competition with Flat Be, the exclusive distributor of Kashwére products in Japan. But his "interpretation" may have been bluff, as no such limitation had been included in the agreement with Flat Be.

It would be possible in principle to interpret an exclusive distribution contract as implicitly forbidding a roundabout process by which exclusivity is destroyed by resale by other distributors to whom the grantor of the exclusive distributorship sells. An exclusive distributor is required to use his best efforts to sell his supplier's product, rather than make his contract worthless to the supplier by substituting products of other suppliers. See *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214, 215 (N.Y. 1917) (Cardozo, J.), where we read that the distributor's "promise to pay [the supplier] one-half of the profits and revenues resulting from the exclusive agency and to render accounts monthly was a promise to use reasonable efforts to bring profits and revenues into existence." The common law interpolates a best-efforts clause into an exclusive distributorship contract silent about best efforts—and likewise it could be argued that the grantor of an exclusive distributorship should be forbidden to impair the value of exclusivity to the distributor by failing to prevent his other distributors from reselling in the exclusive distributor's territory.

There is a remarkable paucity of cases that address the issue, and no consensus on how the issue should be resolved. In *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,

650 F. Supp. 2d 314, 323–25 (S.D.N.Y. 2009) (New York law), for example, the court rejected a Peruvian bottler's argument that its contract with Pepsi Cola—which gave the bottler exclusive distribution rights in designated parts of Peru—obligated Pepsi to prevent bottlers in other parts of the country from reselling Pepsi products in the plaintiff's exclusive territory. See also *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 73 (2d Cir. 1979) (concurring opinion); *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 646–47 (3d Cir. 1958) (Illinois law).

A case that came close to implying such a duty also involved Pepsi Cola: *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1258–59 (10th Cir. 2005), deemed such a duty implicit in an exclusive distribution agreement, but it did so on the basis of evidence that Pepsi had promised bottlers that it would protect their territories from encroachment by other Pepsi bottlers and had even established a program to detect sales by a bottler into another's territory and had advertised the program in an attempt to persuade bottlers to enter into exclusive agreements with the company. The opinion contains language suggesting that imposition of such a duty would make sense generally in the context of exclusive distribution agreements, but it is not clear that the court would have imposed it in the absence of the evidence that we've just summarized.

*Societe Marocaine des Establissements P. Parrenin v. Gardner-Denver Co.*, 137 F. Supp. 210, 212 (S.D.N.Y. 1956), holds that "under Illinois law [which the parties had specified would govern any dispute between them over their contract] a manufacturer is liable for violation of an exclusive sales agency agreement where it is shown that he directly sold his

goods into the distributor's exclusive territory. Where the sale is not made directly by him, he may also be held upon a showing that he had knowledge that the destination of the product sold by him to a third party was within the exclusive territory covered by the contract" (footnote omitted). As the basis for its holding the court cited two old Illinois cases—*Ed. C. Smith Furniture Co. v. Peter & Volz*, 205 Ill. App. 379, 380 (1917), and *Marshall v. Canadian Cordage & Mfg. Co., Limited*, 160 Ill. App. 114, 121 (1911)—that indeed are on point.

Yet recall that the Third Circuit in the *Parkway* case, also applying Illinois law, later reached the opposite conclusion. It did not cite the two intermediate-appellate cases on which the district court in the *Societe Marocaine* case had relied, but relying on other Illinois contract cases reasoned that "in Illinois the intention of the parties to a contract is determined by the language of the contract itself, and the courts may not construe into a writing provisions that are not there. What is more, contracts which restrict the free and unlimited exchange of services or commodities are strictly construed, and the restrictions will be extended no further than the language of the contract absolutely requires. Applying these legal principles to the Parkway contract, we cannot construe the terms of that writing so as to add a term precluding a sale and delivery of 'Hollywood' bread [made by Parkway] to American Stores within Parkway's territory, regardless of any use the American Stores will make of the bread after they receive it." 255 F.2d at 646–47 (citations omitted).

There are compelling reasons to reject an implicit duty to prevent one's distributors from reselling in an exclusive distributor's territory. It is one thing to require a distributor to

use his best efforts to sell his supplier's product; it is another to require the supplier to police all his distributors in order to make sure that none of them sell in any territory in which the supplier has created an exclusive distributorship. Depending on the number and location of the distributors (TMG's distributors presumably are spread across the world, since it sells worldwide—except of course in Japan), it may be infeasible to police them; and so if Seltzer had asked for an express provision requiring policing, TMG would either have refused or have insisted on compensation.

And would the duty extend to a distributor who sold to another distributor who resold in Japan? When there is no uniform rule, like the rule of the *Duff-Gordon* case, that courts can with some confidence interpolate into an entire class of contracts, the matter should be left to the contracting parties to work out.

We can assume that if in an attempt to take over the Japanese market TMG had encouraged, assisted, bribed, etc. its distributors to resell in Japan, and to that end to buy more Kashwére products from TMG than they would otherwise have done, Seltzer would have a strong argument that TMG had violated the license it had granted him, by acting in bad faith. For "good faith" in performance of a contract, like "best efforts" in the performance of a contract of exclusive distributorship, is a term that courts interpolate into most contracts. See, e.g., *Wisconsin Electric Power Co. v. Union Pacific R.R.*, 557 F.3d 504, 510 (7th Cir. 2009). But there is no evidence of bad faith by TMG. The idea that by providing hang tags, which are simply fancy labels, in Japanese to distributors who TMG had been informed were reselling Kashwére products in Japan TMG was encouraging its distributors to

sell there is far-fetched when one considers that a custom hang tag can be bought for 7 cents. Print Runner, "Hang Tags," www.printrunner.com/hang-tags.html?gclid=CKfWr v7C8MACFQaNaQodhCEAHg&gclsrc=aw.ds (visited Nov. 12, 2014).

All this said, the burden of proving that the license had some implicit term limiting non-Japanese distributors of Kashwére products from reselling in Japan was on Seltzer, who failed to produce any persuasive evidence of it. And Seltzer's contention that the sale in Japan by TMG distributors of a Kashwére product inferior in quality to what Flat Be was selling violated Flat Be's trademarks falls with our determination that TMG was not responsible for sales by its distributors.

Seltzer's second counterclaim charges TMG with having made direct sales into Japan, which if true would clearly have violated his license. But all that the charge is based on is an unsubstantiated inference from purchase orders of $1.3 million that Flat Be placed—none of them with TMG. Seltzer contends that the sales were made by TMG in secret, and that TMG kept for itself whatever profits from the sales ought to have gone to Seltzer under his license. But Flat Be obviously would know if it had purchased goods directly from TMG—and Flat Be is Seltzer's ally in this litigation—yet it offered no evidence to support the allegation of secret sales.

Seltzer raises two other objections to the district court's rulings. The first is its dismissal of his promissory-fraud claim. Although promissory fraud is generally not actionable in Illinois, there is an exception for cases in which "the false promise or representation of intention of future conduct is

the scheme or device to accomplish the fraud." *Steinberg v. Chicago Medical School*, 371 N.E.2d 634, 641 (Ill. 1977). Seltzer argues that before the deal that transferred his Kashwére business to TMG, the TMG principals were scheming to sell in Japan in violation of the deal reserving the Japanese market to him. But his evidence consists merely of discussions by the principals of the lucrative character of the Japanese market; there is no evidence of an actual scheme to violate any promise that was part of the deal. The second objection is to the denial of a motion by Seltzer to amend his counterclaim to add a charge of conversion. The objection is a throwaway; it is stated but not developed.

In summary, the district judge was correct to grant summary judgment in favor of TMG on Seltzer's and Flat Be's counterclaims, but incorrect to grant summary judgment in favor of Seltzer and Flat Be on TMG's claims. The dismissal of the counterclaims is therefore affirmed and the dismissal of TMG's claims reversed, and the case is remanded for further proceedings consistent with the analysis in this opinion respecting those claims.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.