POSNER, Circuit Judge,
concurring.
I agree with the decision to reverse the judgment of the district court and remand for a calculation of damages. But I think the majority opinion’s analysis could be simplified, and in addition I disagree with the majority’s discussion of damages for the breach of the second contract.
This is a diversity suit that presents issues of Indiana contract law. Benton County Wind Farm, the plaintiff and appellant, operates a plant in northwestern Indiana’ that uses wind to push turbines that generate electricity, which it sells. In 2006, before construction of the wind farm had begun, Duke Energy, a large electrical company also in Indiana, signed a 20-year contract with Benton in which Duke agreed either to pay a fixed price for the output of the wind-powered electrical plant that Benton was planning to build, or to refuse to accept the output and instead pay liquidated damages to compensate Benton for the loss of business. In 2007 Benton proposed tb construct additional turbines, which would increase the wind farm’s capacity to generate electricity; and Duke and another buyer, called Vectren Power Supply (not a party to this case), agreed to split the purchase of the additional power. A second contract, this one between Benton on the one hand and both Duke and Vectren on the other, defined the amounts Vectren and Duke would each purchase, resolved certain issues arising from the fact that there would be two buyers for Benton’s output, and forbade Duke to take steps to reduce Benton’s output. The first contract is the “Renewable Wind Energy Project Purchase Power Agreement” (I’ll call it just the “Purchase Power Agreement”) and the second (dis *306 cussed in the majority opinion only for its relevance to liability) is the “Joint Energy Sharing and Operating Agreement.” I’ll discuss the two contracts in that order.
MISO (Midcontinent Independent System Operator) — the Regional Transmission Organization that coordinates and to a considerable extent controls the transmission of electricity in a number of midwest-ern and southern states, including Indiana, and also in a chunk of Canada — buys energy from producers like Benton. It. had begun acquiring wind-powered electricity on the basis of competitive offers instead of buying all the wind energy offered to it. Sometimes producers of wind energy would even have to pay MISO to induce it to accept their energy, which they were willing to do because even if they lost money on the sale they’d get a valuable tax credit for producing renewable energy.
Duke would be an intermediary between Benton and MISO, buying from Benton and selling to MISO. It offered the energy it was buying from Benton to MISO at a price of $0/MWh (that is, at a zero price for each unit of energy equal to the amount of electricity that a megawatt of output would transmit to MISO over one hour). Obviously that offer price was.not a market price, and MISO paid Duke (as it did the other suppliers of electricity to the transmission grid) the market price if it exceeded the offer price. If however the market price happened to be zero, Duke still would deliver the energy to MISO at the, free offer price (i.e., $0/MWh), but it would never sell to MISO at a negative price, as that would mean that Duke was paying both Benton (for the energy) and MISO (for accepting delivery of the energy)-
It might seem that a market price would never be negative, but actually it could be because of an excessive supply of wind energy and/or inadequate transmission capacity. And- when it was negative, and Duke therefore wouldn’t pay MISO to take Benton’s energy, MISO would tell Benton to stop producing; otherwise the electricity could keep coming, even though MISO was surfeited with electricity, which is why it wouldn’t accept any more wind-powered electricity unless paid to take it.
The Purchase Power Agreement, the first of the two agreements between Benton and Duke at issue in this case, requires that “Buyer [Duke] shall accept and purchase from Seller [Benton] Electrical Output of the Plant,” and “Seller will not have the right to sell to third parties any of the Electrical Output” unless Duke has refused to accept it. The contract goes on to provide that “in the event that Buyer fails to accept delivery of all of the Electrical Output at the Point of Metering, whether due to Buyer’s failure to.obtain Transmission Service .... or for any [other] reason” (with some exceptions), Duke must pay Benton liquidated damages unless Benton can find some other company to buy the power that Duke is refusing to accept from it. The liquidated damages are to consist of the contract price for-the power plus- the production tax credit that Benton would have earned by producing the power. The credit is a tax break that the federal government provides to-producers of renewable energy sources, such as wind power, to encourage efficiency in the production and transmission of electricity. U.S. Department of Energy, “Renewable Electricity Production- Tax Credit (PTC),” http:// energy.gov/savings/renewable-electricity-production-tax-credit-pte (visited December 5, 2016).
Duke argues and the district court ruled that because the contract defines “Electrical Output” as “the entire electric energy output of the " [Benton] Plant delivered to the Point of Metering,” Duke has no liability for refusing power not delivered to that *307 point. The district court’s ruling ignores, however, the fact — not contested by Duke, and surely known by senior staff in the electrical-generation and transmission industry of Indiana and therefore implicit in any contract made by the electrical firms in that market — that it’s -physically impossible for Duke to reject electricity that has reached the Point of Metering. Electricity dispatched by Benton flows to the Point of Metering but doesn’t stop there, because traveling as it does at upwards of half the speed of light it enters almost instantaneously into the transmission grid.
It’s not that electricity can’t be stopped because of the speed at which it travels; every time one turns off an appliance that draws electricity the electrical flow to the appliance is stopped. But a flow of electricity can’t be stopped at the Point of Metering, because it’s merely the point at which electricity flowing from the Benton Wind Farm enters the grid (the Purchase Power Agreement refers to it as an “interconnection point”). There is no switch at that point, which could be turned off to stop the flow of electricity. Once energy is generated by Benton and transmitted to the Point of Metering, Duke has no way to prevent it from flowing into the grid.
This is not to say that points of metering are unimportant; they -play an important role in billing and more generally in managing the flow of electricity between electrical companies. See New York Independent System Operator, “Revenue Metering Requirements Manual” p.- .1-1- (August 2013), www.nyiso.com/public/webdocs/ markets_operations/documents/Manuals_ and_Guides/Manuals/Administrative/rev_ mtr_req_mnl.pdf (also visited on December 5, 2016). But a point of metering is not a wall or an on-off switch. Article 8 of the Purchase Power Agreement is explicit that the equipment at the point of metering consists of meters (measuring devices), not on-and-off switches or shut-off valves.
Because there is no such equipment at the Point of Metering, 'the only way Duke can refuse to receive Benton’s electricity is to tell it not to send its output to (which also means beyond) the Point of Metering. Unless required to pay liquidated damages to Benton when it tells Benton not to send electricity to the Point of Metering, Duke would be avoiding all liability simply by telling Benton not to send electricity Duke’s way; the liquidated-damages clause in the contract would thus be a nullity.
Benton further appeals to a provision in the contract which states that “the Parties will reasonably cooperate with each other with respect to the bidding and scheduling with ... the RTO [i.e., MISO] of the Electrical Output to be sold and delivered by Seller [Benton] and accepted and purchased by Buyer [Duke]. Buyer will be responsible for all such bidding and scheduling.” Reasonable cooperation would appear to require that Duke not block Benton from supplying power to MISO without compensating Benton in accordance with the liquidated-damages provision. This interpretation is reinforced by section 6.3 of the contract, which provides that “nothing in Section 6.2 ... shall require Seller [i.e., Benton] to take any action effecting ... any reduction in the Electrical Output.” By. ordering and-thus compelling Benton to reduce its delivery of. energy to the Point of Metering, Duke could be thought to be violating, section 6.3 by requiring Benton to reduce its output, and therefore to be required to pay liquidated damages to compensate Benton for the loss of revenue resulting from the reduction in delivery.
Another provision in the Purchase Power Agreement states, however, that the “Seller [i.e., Benton] will not have the right to sell to third parties any of the Electrical *308 Output” unless Duke “fails to accept delivery.” The clause we've italicized frees Benton to sell to other electrical companies if Duke refuses to buy from it, and if Benton sells to other companies at the same price that Duke would pay, it would not be entitled to liquidated damages, because it wouldn’t have.suffered a loss (aside from extra transmission expenses, which the contract covers). Similarly, if Benton finds another buyer willing to buy its energy but only at a lower price than Duke is willing to pay, the liquidated damages owed by Duke to Benton will fall by the amount of revenue that Benton is able to recoup from the new buyer.
That the Purchase Power Agreement itself does not mention that electricity generated by Benton and fed into Duke’s transmission line does not stop at the Point of Metering, but continues unaltered into the transmission grid, is not fatal to Benton’s argument for liquidated damages. A court cannot decide a suit for breach of contract by ignoring facts critical to the alleged breach. Krieg v. Hieber, 802 N.E.2d 938, 944 (Ind. App. 2004). ‘“This is upon the principle that the court may be placed, in regard to the surroundings and circumstances, as nearly as possible in the position of the parties whose writings are to be interpreted.” Ransdel v. Moore, 153 Ind. 393, 53 N.E. 767, 769 (1899). The district judge indicated awareness of the physics of transmission, how a wind turbine works, and how MISO structures its bidding process. All these were uncontested facts essential to understanding the contracts at issue, facts of which the judges on this panel can take judicial notice. And though hardly necessary we can also appeal to the familiar analogy of the medieval law regarding '‘blood letting” in the streets of the Italian city of Bologna— the law that, as famously explained in William Blaekstone’s Commentaries on the Laws of England, vol, 2, p. 60 (1765), stated that “whoever drew blood in the streets should be punished with the utmost severity.” Blackstone asked whether the law should have been interpreted to make punishable a surgeon “who opened the vein of a person that fell down in the street with a fit.” He thought not, saying that “the . fairest and most rational method to interpret the will of the legislator, is by exploring his intentions at the time when the law was made, by signs the most .natural and probable. And these signs are either the words, the context, the subject matter, the effects and consequence, or the spirit and reason of the law — As to the effects and consequence, the rule is, where words bear either none, or a very absurd signification,' if literally understood, we nmst a little deviate from the received sense of them” (emphases added). The law did not mention surgeons, but Blackstone thought it obvious that the legislators, who must have known something about surgeons (actually “barber surgeons”), had not intended' the law to apply to them. It is likewise obvious that firms engaged in the production and transmission of electricity know that it doesn’t stop at a “Point of Metering,” as if it were water stopped by a dam.
Another factor to be considered, however, is the duration of the contract — 20 years. As pointed out in an amicus' curiae brief submitted by the American Wind Energy Association “in Support- of-Neither Party,” wind energy entrepreneurs must make a large investment in creating wind farms, and having a predictable flow of revenue is important in enabling the entrepreneurs to attract the needed investment. Benton County Wind Farm, will have lost that predictable flow if the .district court’s decision is affirmed. Cutting the other way, however, is the pincers that Duke Energy has been placed in as a result of developments apparently not foreseen by *309 the parties when they drafted the Purchase Power Agreement back in 2006— namely the sprouting of a number of other wind energy farms in Indiana where once Benton had been one of only a few. The electrical energy transmitted by the growing Indiana wind energy industry crowded the transmission grid and led to efforts by MISO to reduce the flow. The electricity that Duke buys from Benton is sold -to MISO at the Point of Metering at what is called the Locational Marginal Price (LMP), which is based on energy costs, congestion costs, and line losses. The price is set unilaterally by MISO rather than negotiated with Duke. As additional wind energy farms came on line, the congestion component of the LMP soared to the point at which sellers to MISO, such, as Duke, had to pay MISO to take their electricity; that is, the price to MISO had turned negative. That meant that for electricity bought from Benton and sold to MISO at the point of metering, Duke would be losing money because it would be paying both Benton for the electricity and MISO for accepting the electricity forwarded to it by Duke.
Duke could avoid such a loss by bidding $0/MWh to MISO, so that upon receiving a negative-price offer from MISO (that is, being told by MISO that MISO would not pay a positive price for electricity generated by Benton for resale by Duke to MISO), MISO would direct Benton not to transmit electricity to Duke. The result was to curtail Benton’s output and revenues, except insofar as Benton was able to find other buyers for its electricity — an issue not illuminated by the parties’ submissions in this litigation.
Duke is arguing that the change in the market caused by wind energy congestion, which in turn caused MISO,often to refuse to accept transmission of such energy without being paid to accept it, altered Duke’s obligations under the contract, which had not contemplated Duke’s having to pay both Benton and MISO for the same electricity — Benton to transmit the electricity at the Point of Metering and MISO to receive it there from Duke. Recall the provision in Duke’s contract with Benton that requires the parties to “reasonably cooperate with each other with respect to the bidding and scheduling with ... [MISO] of the Electrical Output to be sold and delivered by [Benton] and accepted and purchased by [Duke].” One possible interpretation of reasonable cooperation is that Duke must buy all the electricity that Benton wants to sell it, but another is that Benton must accept a reduction in the amount of electricity bought from it by Duke in recognition that “reasonable cooperation” requires a compromise in which both parties accept a reduction in compensation as a result of a development beyond them control — that development in this case being the advent of an unexpected number of new wind energy farms, requiring in turn an alteration in MISO’s purchasing policies. But it’s unlikely that this provision was intended to place limits on the financial obligations of the parties to each other in the bidding process — the clause is terribly fuzzy and the liquidated damages clauses deal adequately with the problem.
Yet some years ago, Wisconsin Electric Power Co. v. Union Pacific R.R., 557 F.3d 504 (7th Cir. 2009), noted that “the doctrine-of impossibility in the common law of contracts excuses performance when it would be unreasonably costly (and sometimes downright impossible) for a party to carry out its contractual obligations. If the doctrine is successfully invoked, the contract is rescinded without liability. The standard explanation for the doctrine is that nonperformance is not a breach if it is caused by a circumstance ‘the nonoccurrence, of which was a “basic assumption on *310 which the contract was made.’”” Id. at 505, quoting Restatement (Second) of Contracts, introductory note to ch. 11, preceding § 261 (1981), quoting UCC § 2-615. Conceivably, to require Duke to pay a positive price to Benton for wind-powered energy and receive a negative price for the same energy from MISO (that, or pay liquidated damages), resulting in Duke’s obtaining zero or negative revenue, could be regarded as “unreasonably costly” to Duke, requiring a modification of its contract with Benton. But neither in the district' court nor in this court has Duke argued impossibility. It did plead as an affirmative defense a provision in the contract which states that enforcement is to be limited by general principles of equity, including “concepts of ... reasonableness.” But it can’t be that the mere fact that additional wind farms were built in Indiana after the contract was signed made enforcement of the contract, and in particular invocation of the liquidated-damages provision by Benton, unreasonable.
So Duke violated the Purchase Power Agreement, and therefore I agree with the majority that the judgment of the district court regarding that branch of the case must be reversed and the case remanded for a determination of the amount of liquidated damages to which Benton is entitled.
The second agreement between Duke and Benton is the Joint Energy Sharing and Operating Agreement. This agreement requires Duke to buy part of the additional output of the Benton wind farm resulting from its increasing its production capacity by 30 megawatts, and (in this respect much like the Purchase Power Agreement) denies Duke “the right to curtail or reduce [Benton’s] Total Facility Output,” defined as “the total electrical energy produced by [Benton] ... as measured at the Delivery Point,” which is another name for the Point of Metering. Duke violated the contract by using MISO’s competitive bidding process to curtail Benton’s production whenever market prices are negative. Since Duke can curtail Benton’s output only as “expressly provided” in the Purchase Power Agreement, and the only express provision for reducing output requires Duke to pay liquidated damages, Duke’s curtailment of Benton’s output without paying liquidated damages is a breach of the second contract between the parties as well as of the first.
This is clear enough to require reversal of the district court’s rejection of Benton’s argument that Duke breached the second contract. The majority opinion treats Duke’s breach of the second contract as a duplicate source of the same damages as required by the breach of the first contract. But the second contract determines how much of the expanded output of the Benton wind farm Duke is required to pay for, and if it fails to pay, how much in damages it will owe Benton.
Regarding the second point, the issue of damages, the second contract (the Joint Energy Sharing and Operating Agreement) provides that “each party’s liability hereunder shall be limited to direct actual damages only,” and “neither party shall be liable for ... lost profits or other business interruption damages.” There is no definition of “direct actual damages,” and the meaning of the term has not been briefed on appeal. Duke may owe Benton less in “direct actual damages” for its failure to buy any of the expanded output of the Benton wind farm than it would owe were there a liquidated-damages clause in the second contract. Benton’s losses from not operating its wind farm seem most like “lost profits or other business-interruption damages.” The amount of damages to which Benton is entitled by Duke’s breach of the second agreement therefore remains to be determined on remand. A further *311 complication is that although there’s no liquidated-damages clause in the second contract, the contract refers to the Purchase Power Agreement throughout in such a way as to indicate that the parties may have expected the liquidated-damages clause to apply, for otherwise,. given that direct actual damages are likely to be zero or close to zero, the. purpose of the Joint Energy Sharing and Operating Agreement would be defeated. Benton wanted to secure a steady income stream before it began constructing the new turbines, just as it had wanted before constructing the plant in the first place. It had the incentive under both contracts to have fallback protection in the form of a liquidated-damages clause.
I trust that on remand the district judge will be conscious of the “long tradition in contract law of reading contracts sensibly,” not as “parlor games but [as] the means of getting the world’s work done.” Beanstalk Group, Inc. v. AM General Corp., 283 F.3d 856, 860 (7th Cir. 2002), quoting Rhode Island Charities Trust v. Engelhard Corp., 267 F.3d 3, 7 (1st Cir. 2001).